## UNITED STATES v. FLORES

No. 567. Argued March 14, 1933.—Decided April 10, 1933

*Solicitor General Thacher,* with whom *Mr. Robert P. Reeder* was on the brief, for the United States.

140

*Mr. John V. Lovitt* for appellee.

Mr. Justice Stone delivered the opinion of the Court.

By indictment found in the District Court for Eastern Pennsylvania, it was charged that appellee, a citizen of the United States, murdered another citizen of the United States upon the S.S. "Padnsay," an American vessel,

while at anchor in the Port of Matadi, in the Belgian Congo, a place subject to the sovereignty of the Kingdom of Belgium, and that appellee, after the commission of the crime, was first brought into the Port of Philadelphia, a place within the territorial jurisdiction of the District Court. By stipulation it was conceded, as though stated in a bill of particulars, that the "Padnsay," at the time of the offense charged, was unloading, being attached to the shore by cables, at a point two hundred and fifty miles inland from the mouth of the Congo River.

The District Court, following its earlier decision in *United States ex rel. Maro* v. *Mathues*, 21 F. (2d) 533, affirmed, 27 F. (2d) 518, sustained a demurrer to the indictment and discharged the prisoner on the ground that the court was without jurisdiction to try the offense charged. The case comes here by direct appeal under the Act of March 2, 1907, c. 2564, 34 Stat. 1264, 18 U.S.C. § 682 and § 238 of the Judicial Code, as amended by Act of February 13, 1925, 28 U.S.C. § 345, the court below certifying that its decision was founded upon its construction of § 272 of the Criminal Code, 18 U.S.C. § 451.

Sections 273 and 275 of the Criminal Code, 18 U.S.C. §§ 452, 454, define murder and fix its punishment. Section 272,[1] upon the construction of which the court below rested its decision, makes punishable offenses defined by other sections of the Criminal Code, among other cases,

---

[1] § 272. "The crimes and offenses defined in this chapter shall be punished as herein prescribed:

"First: When committed upon the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, or when committed within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State on board any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, or District thereof. . . .".

"when committed within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state, on board any vessel belonging in whole or in part to the United States" or any of its nationals. And by § 41 of the Judicial Code, 28 U.S.C. § 102, venue to try offenses "committed upon the high seas or elsewhere out of the jurisdiction of any particular State or district," is "in the district where the offender is found or into which he is first brought." As the offense charged here was committed on board a vessel lying outside the territorial jurisdiction of a state, see *Wynne* v. *United States*, 217 U.S. 234; *United States* v. *Rodgers*, 150 U.S. 249, 265, and within that of a foreign sovereignty, the court below was without jurisdiction to try and punish the offense unless it was within the admiralty and maritime jurisdiction of the United States.

Two questions are presented on this appeal, first, whether the extension of the judicial power of the federal government "to all cases of admiralty and maritime jurisdiction," by Art. III, § 2 of the Constitution confers on Congress power to define and punish offenses perpetrated by a citizen of the United States on board one of its merchant vessels lying in navigable waters within the territorial limits of another sovereignty; and second, whether Congress has exercised that power by the enactment of § 272 of the Criminal Code under which the indictment was found.

The court below thought, as appellee argues, that as § 8 of Art. I of the Constitution specifically granted to Congress the power "to define and punish piracies and felonies committed on the high seas, and offenses against the law of nations," and "to make rules concerning captures on land and water," that provision must be regarded as a limitation on the general provision of § 2 of Art. III, that the judicial power shall extend "to all cases of admiralty and maritime jurisdiction"; that as the specific

grant of power to punish offenses outside the territorial limits of the United States was thus restricted to offenses occurring on the high seas, the more general grant could not be resorted to as extending either the legislative or judicial power over offenses committed on vessels outside the territorial limits of the United States and not on the high seas.'

Before the adoption of the Constitution, jurisdiction in admiralty and maritime cases was distributed between the Confederation and the individual States. Article IX of the Articles of Confederation provided that "the United States, in Congress assembled, shall have the sole and exclusive right and power . . . of establishing rules for deciding in all cases what captures on land or water shall be legal, . . . appointing courts for the trial of piracies and felonies committed on the high seas and establishing courts for receiving and determining finally appeals in all cases of captures . . ." So much of the general admiralty and maritime jurisdiction as was not included in this grant of power remained with the States. The powers thus granted were in substance the same as those later conferred on the national government by Article I, § 8 of the Federal Constitution. This section was adopted to carry out a resolution of the Convention " that the national legislature ought to possess the legislative rights vested in Congress by the Confederation." Its primary purpose and effect were to transfer to the newly organized government the powers in admiralty matters previously vested in the Confederation.[2]

---

[2] On July 16, 1787, the Convention agreed *nem. con.* " that the national legislature ought to possess the legislative rights vested in Congress by the Confederation." This proposal was committed to the Committee of Detail in resolution VI, of July 26th. The Committee, on August 6th in Article VII of their draft, recommended a provision, based on the articles of Confederation, which, as formulated by the Convention on August 17th, and amended in matters not now

148

A proposal independently made and considered in the Convention that "the admiralty jurisdiction ought to be given wholly to the national government," resulted in the adoption of Article III, § 2, by which the judicial power of the United States was extended to all cases of admiralty and maritime jurisdiction.[3]

This section has been consistently interpreted as adopting for the United States the system of admiralty and maritime law, as it had been developed in the admiralty courts of England and the Colonies; and, by implication, conferring on Congress the power, subject to well recognized limitations not here material,[4] to alter, qualify, or

material by the Committee on Style, was included in Article I, § 8, of the Constitution. See Madison's Diary, International Edition, pp. 260, 333, 340, 341, 415, 416.

[3] On June 5, 1787, Wilson stated to the Convention that he thought the admiralty jurisdiction should be given wholly to the national government. Resolution XVI, which was referred to the Committee on Detail on July 26th, provided that the jurisdiction of the national judiciary "shall extend to cases arising under laws passed by the general legislature and to such other questions as involve the natural peace and harmony." Wilson was one of the five members of the Committee on Detail, chosen on July 24th, which reported, August 6th, Article XI, dealing with the jurisdiction of federal courts, and containing in § 3 a provision extending the jurisdiction of the Supreme Court "to all cases of admiralty and maritime jurisdiction," which was ultimately incorporated in § 2 of Article III of the Constitution, as finally adopted. Madison's Diary, International Edition, pp. 61, 336, 317, 318, 344.

[4] In Panama R. Co. v. Johnson, 264 U.S. 375, 386, 387, the Court said: "When all is considered, therefore, there is no room to doubt that the power of Congress extends to the entire subject and permits of the exercise of a wide discretion. But there are limitations which have come to be well recognized. One is that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without. Another is that the spirit and purpose of the constitutional provision require that the enactments,—when not relating to matters whose

supplement it as experience or changing conditions may require. *Panama R. Co.* v. *Johnson,* 264 U.S. 375, 386, 388; *Crowell* v. *Benson,* 285 U.S. 22, 39; see *The Oconee,* 280 Fed. 927; *United States* v. *Bevans,* 3 Wheat. 336, 389.

In view of the history of the two clauses and the manner of their adoption, the grant of power to define and punish piracies and felonies on the high seas cannot be deemed to be a limitation on the powers, either legislative or judicial, conferred on the national government by Article III, § 2. The two clauses are the result of separate steps independently taken in the Convention, by which the jurisdiction in admiralty, previously divided between the Confederation and the States, was transferred to the national government. It would be a surprising result, and one plainly not anticipated by the framers or justified by principles which ought to govern the interpretation of a constitution devoted to the redistribution of governmental powers, if part of them were lost in the process of transfer. To construe the one clause as limiting rather than supplementing the other would be to ignore their history, and without effecting any discernible purpose of their enactment, to deny to both the states and the national government powers which were common attributes of sovereignty before the adoption of the Constitution. The result would be to deny to both the power to define and punish crimes of less gravity than felonies committed on vessels of the United States while on the

existence or influence is confined to a more restricted field, as in *Cooley* v. *Board of Wardens,* 12 How. 299, 319,—shall be coextensive with and operate uniformly in the whole of the United States. *Waring* v. *Clarke;* 5 How. 441, 457; *The Lottawanna,* 21 Wall. 558, 574, 577; *Butler* v. *Boston & Savannah S.S. Co.,* 130 U.S. 527, 556, 557; *In re Garnett,* 141 U.S. 1, 12; *Southern Pacific Co.* v. *Jensen,* 244 U.S. 205, 215; *Knickerbocker Ice Co.* v. *Stewart,* 253 U.S. 149, 164; *Washington* v. *Dawson & Co.,* 264 U.S. 219; 2 Story Const., 5th ed., §§ 1663, 1664, 1672."

high seas, and crimes of every grade committed on them while in foreign territorial waters.

As we cannot say that the specific grant of power to define and punish felonies on the high seas operated to curtail the legislative or judicial power conferred by Art. III, § 2, we come to the question principally argued, whether the jurisdiction over admiralty and maritime cases, which it gave, extends to the punishment of crimes committed on vessels of the United States while in foreign waters. As was pointed out by Mr. Justice Story, in the course of an elaborate review of the history of admiralty jurisdiction, in *DeLovio* v. *Boit*, 7 Fed. Cas. 418, 438, admiralty "from the highest antiquity has exercised a very extensive criminal jurisdiction and punished offenses by fine and imprisonment." [5] The English courts have

---

[5] In England, serious offenses committed "upon the sea, or in any other haven, river, creek or place where the admiral or admirals have or pretend to have power, authority or jurisdiction" were, after the statutes 27 Henry VIII, c. 4, and 28 Henry VIII, c. 15, tried according to the course of the common law before specially constituted admiralty courts, the judges of which were designated to sit by the Lord Chancellor. They were often common law judges who sat as commissioners for the trial of crimes within the admiralty and maritime jurisdiction. Holdsworth, History of English Law, 3d ed., Vol. I, 550–552; Hale, Pleas of the Crown, Vol. II, 17; Stephen, History of Criminal Law of England, Vol. II, 16–23; cf. Brooks, Trial of Captain Kidd, 40, 57. There is evidence that during the seventeenth century the courts of Virginia and Maryland tried felonies and piracies which, in England, would have been within the jurisdiction of the Admiralty Commissioners. See Crump, Colonial Admiralty Jurisdiction in the Seventeenth Century, 68. "The practice under the statute, 28 Henry VIII, c. 15, was extended to the Colonies in cases of "piracy, felonies and robberies," by statute 11 and 12 William III, c. 7. See 2 Stephen, *supra*, 20. In Virginia, very shortly before the enactment of this statute, an act was passed adopting the provisions of the statute of Henry VIII. 3 Hening, Statutes at Large of Virginia, 176. For instances of minor offenses prosecuted in the Colonial Courts of Vice-Admiralty in the eighteenth century, see Hough's Cases in Vice-Admiralty and Admiralty: *King* v. *Booth*

consistently held that jurisdiction is not restricted to ves-sels within the navigable waters of the realm, but follows its ships upon the high seas and into ports and rivers within the territorial jurisdiction of foreign sovereigns. *Queen* v. *Carr & Wilson,* 10 Q.B.D. 76; *Queen* v. *Anderson,* L.R. 1 Crown Cases Reserved 161; *Rex* v. *Allen,* 1 Moody C.C. 494; see *Rex* v. *Jemot,* 1 Russell on Crimes, 4th ed. 153.

The criminal jurisdiction of the United States is wholly statutory, see *United States* v. *Hudson,* 7 Cranch 32, but it has never been doubted that the grant of admiralty and maritime jurisdiction to the federal government includes the legislative power to define and punish crimes committed upon vessels lying in navigable waters of the United States. From the very organization of the government, and without intermission, Congress has also asserted the power, analogous to that exercised by English courts of admiralty, to punish crimes committed on vessels of the United States while on the high seas or on navigable waters not within the territorial jurisdiction of

(1730), p. 12; *King* v. *Burgess* (1748), p. 56; *King* v. *White* (1754), p. 81. Eighteenth century Vice-Admiralty commissions in the Colonies contain verbal grants of jurisdiction over crimes within the admiralty jurisdiction. Publications of Colonial Society of Massachusetts, vol. II, 237, 238; Benedict on Admiralty, 5th ed., 787–811; Record Book of Maryland Court of Vice-Admiralty in Manuscripts Division of the Library of Congress, fols. 74, 82. And there is evidence of the trial of piracies in the Colonies, see Jameson, Privateering and Piracy in the Colonial Period, pp. 143, 278, note 1, 286, note 1; and see 577 to 580. Compare Rhode Island: Letters from Governors in America, 1756, P.R.O.: CO. 5: 17, p. 639 (Ms. copy in Library of Congress), which indicates a trial at Providence for murder on the high seas in a special admiralty court constituted under the statute 11 and 12 William III. Captain Kidd, who was arrested in Boston prior to 1700 for murder and piracy on the high seas, was transported to England for trial before an admiralty court organized pursuant to royal commission (see 14 Howell's State Trials, 123, 147, 191) and this practice may well have continued after the statute of William III.

a State. The Act of April 30, 1790, c. 9, § 8, 1 Stat. 112, 113, provided for the punishment of murder committed " upon the high seas or in any river, haven, basin or bay out of the jurisdiction of any particular state," and provided for the trial of the offender in the district where he might be apprehended or " into which he may first be brought." Section 12 of this Act dealt with manslaughter, but only when committed upon the high seas. It is true that in *United States* v. *Bevans,* 3 Wheat. 336, the prisoner, charged with murder on a warship in Boston Harbor, was discharged, as was one charged with manslaughter committed on a vessel on a Chinese River in *United States* v. *Wiltberger,* 5 Wheat. 76. But the judgments were based not upon a want of power in Congress to define and punish the crimes charged, but upon the ground that the statute did not apply, in the one case, for the reason that the place of the offense was not out of the jurisdiction of a state, and in the other, because the offense, manslaughter, was not committed on the high seas.[6]

The Act of March 3, 1825, c. 65, § 4, 4 Stat. 115, provided for the punishment of any person committing murder "upon the high seas or in any arm of the sea or in any river, haven, creek, basin or bay, within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state," and § 22 provided for the punishment of assault with a dangerous

---

[6] In *United States* v. *McGill,* 4 Dall. 426, Mr. Justice Washington, sitting in the Circuit Court in a case where the offense charged was murder committed on a vessel lying in the haven of Cape Francois, held that the statute did not apply where the mortal stroke was given on the vessel, but the death occurred on shore, since the murder was not committed on the high seas or any river, basin or bay. He doubted whether the offense thus committed was cognizable in admiralty in the absence of statute, but stated he had no doubt of the power of Congress to provide for it.

weapon, committed under similar circumstances.[7] The provisions of the latter section, carried into § 5346 of the Revised Statutes, were upheld in *United States* v. *Rodgers, supra,* as a constitutional exercise of the power of Congress to define and punish offenses occurring in American vessels while within territorial waters of another sovereignty. Rodgers had been convicted of assault with a dangerous weapon, committed on a vessel of the United States lying in the Detroit River within the territorial jurisdiction of Canada, and his conviction was sustained by this Court. It was assumed that the statute was applicable only with respect to offenses committed on the high seas and waters tributary to them, and the decision turned on whether the Great Lakes were to be deemed "high seas" within the meaning of the statute. It was held that they were, and the power of Congress to punish offenses committed on an American vessel within the territorial waters of Canada, tributary to the Lakes, was expressly affirmed.

As the offense charged here appears to have been committed on an American vessel while discharging cargo in port, the jurisdiction is not affected by the fact that she

---

[7] By § 5, the provisions of the act of 1825 were specifically made applicable to any offense " committed on board of any ship or vessel, belonging to any citizen or citizens of the United States, while lying in a port or place within the jurisdiction of any foreign state or sovereign, by any person belonging to the company of said ship, or any passenger, on any other person belonging to the company of said ship, or any other passenger . . ." This language was not, in terms, incorporated in the Revised Statutes.

Daniel Webster, Chairman of the House Committee having in charge the bill which became the Act of 1825, pointed out in introducing it that the offenses for which it provided punishment had actually occurred upon our ships, while lying in the harbors of foreign nations and had gone unpunished for want of such legislation. Gall & Seaton's Register of Debates in Congress, Vol. 1, cols. 154, 158.

was then at a point on the Congo remote from the sea, where it does not affirmatively appear that the water is salt or tidal. On this point also *United States* v. *Rodgers, supra,* is controlling, for there the offense committed within a foreign territorial jurisdiction was upon non-tidal fresh water.[8]

---

[8] That the jurisdiction in admiralty " extends as far as the tide ebbs and flows " was a convenient definition of its limits in the historic controversy over the conflicting claims of jurisdiction of the English courts of common law and admiralty over waters within the realm (see *DeLovio* v. *Boit,* 7 Fed. Cas. 418, 428; compare *Waring* v. *Clarke,* 5 How. 441, 453; *United States* v. *Coombs,* 12 Pet. 72; *Manchester* v. *Massachusetts,* 139 U. S. 240), a conflict which was but an aspect of the struggle for supremacy of the common law and the prerogative courts. Cf. Julius Goebel, Cases and Materials on the Development of Legal Institutions (1931), 225. But it is a very different question whether the traditional jurisdiction of admiralty conferred upon the United States by the Constitution, extends to non-tidal waters. In England public navigable waters are tidal, and with respect to them the terms have been used interchangeably. But there is nothing in the nature of maritime transactions or the maritime law, which is concerned with the affairs of vessels and those who sail, own, use or injure them, which need limit its application to tidal waters. See Benedict on Admiralty, 5th ed., §§ 39, 43. This was recognized and acted upon by the Vice-Admiralty Courts in the Colonies. See *Waring* v. *Clarke, supra,* 454, 455, 456. In *Queen* v. *Anderson,* L. R. 1 Crown Cases Reserved 161, Mr. Justice Blackburn, in upholding the admiralty jurisdiction over manslaughter committed on a British ship forty-five miles up the River Garronne, said, p. 169, that " the jurisdiction of the Admiralty extends over vessels, not only when they are on the open sea, but also when in places where great ships do generally go." And in *Rex* v. *Allen,* 1 Moody C. C. 494, the judges of England upheld the admiralty jurisdiction of the crime of larceny committed on a British vessel on a Chinese river, twenty or thirty miles from the sea, although it did not appear that the water was tidal. Following the decision in *The Genesee Chief,* 12 How. 443, that there was constitutional power in Congress to extend the admiralty jurisdiction to non-tidal waters of the United States navigable in fact, civil jurisdiction of admiralty over a collision occurring in the non-tidal waters of the Detroit River within the territorial jurisdiction

The appellee insists that even though Congress has power to define and punish crimes on American vessels in foreign waters, it has not done so by the present statute since the criminal jurisdiction of the United States is based upon the territorial principle and the statute cannot rightly be interpreted to be a departure from that principle. But the language of the statute making it applicable to offenses committed on an American vessel outside the jurisdiction of a State "within the admiralty and maritime jurisdiction of the United States" is broad enough to include crimes in the territorial waters of a foreign sovereignty. For Congress, by incorporating in the statute the very language of the constitutional grant of power, has made its exercise of the power co-extensive with the grant. Compare *The Hine* v. *Trevor*, 4 Wall. 555.

It is true that the criminal jurisdiction of the United States is in general based on the territorial principle, and criminal statutes of the United States are not by implication given an extra-territorial effect. *United States* v. *Bowman*, 260 U.S. 94, 98; compare *Blackmer* v. *United States*, 284 U.S. 421. But that principle has never been thought to be applicable to a merchant vessel which, for purposes of the jurisdiction of the courts of the sovereignty whose flag it flies to punish crimes committed upon it, is deemed to be a part of the territory of that sovereignty, and not to lose that character when in navigable

---

of Canada, was sustained in *The Eagle*, 8 Wall. 15, and a like jurisdiction over a crime defined and punished by Act of Congress was sustained in *United States* v. *Rodgers*, 150 U. S. 249. See also *Jackson* v. *The Magnolia*, 20 How. 296; *The Hine* v. *Trevor*, 4 Wall. 555; and *In re Garnett*, 141 U. S. 1, 17, 18, where Mr. Justice Bradley said, p. 18, that " we have no hesitation in saying that the Savannah River from its mouth to the highest point to which it is navigable is subject to the maritime law and the admiralty jurisdiction of the United States."

waters within the territorial limits of another sovereignty. *United States* v. *Rodgers, supra;* compare *Thomas* v. *Lane,* 2 Sumner 1; *Queen* v. *Anderson, supra; Queen* v. *Carr & Wilson, supra; Rex* v. *Allen, supra; Rex.* v. *Jemot, supra.* This qualification of the territorial principle in the case of vessels of the flag was urged by Mr. Webster while Secretary of State, in his letter to Lord. Ashburton [9] of August 1, 1842, quoted with approval in *United States* v.

[9] "It is natural to consider the vessels of a nation as parts of its territory, though at sea, as the State retains its jurisdiction over them; and, according to the commonly received custom, this jurisdiction is preserved over the vessels even in parts of the sea subject to a foreign dominion. This is the doctrine of the law of nations, clearly laid down by writers of received authority, and entirely conformable, as it is supposed, with the practice of modern nations. If a murder be committed on board of an American vessel by one of the crew upon another or upon a passenger, or by a passenger on one of the crew or another passenger, while such vessel is lying in a port within the jurisdiction of a foreign State or sovereignty, the offense is cognizable and punishable by the proper court of the United States in the same manner as if such offence had been committed on board the vessel on the high seas. The law of England is supposed to be the same. It is true that the jurisdiction of a nation over a vessel belonging to it, while lying in the port of another, is not necessarily wholly exclusive. We do not so consider or so assert it. For any unlawful acts done by her while thus lying in port, and for all contracts entered into while there, by her master or owners, she and they must, doubtless, be answerable to the laws of the place. Nor, if her master or crew, while on board in such port, break the peace of the community by the commission of crimes, can exemption be claimed for them. But, nevertheless, the law of nations, as I have stated it, and the statutes of governments founded on that law, as I have referred to them, show that enlightened nations, in modern times, do clearly hold that the jurisdiction and laws of a nation accompany her ships not only over the high seas, but into ports and harbors, or wheresoever else they may be water-borne, for the general purpose of governing and regulating the rights, duties, and obligations of those on board thereof, and that, to the extent of the exercise of this jurisdiction, they are considered as parts of the territory of the nation herself." 6 Webster's Works, 306, 307.

*Rodgers, supra,* 264, 265. Subject to the right of the territorial sovereignty to assert jurisdiction over offenses disturbing the peace of the port, it has been supported by writers on international law, and has been recognized by France, Belgium, and other continental countries, as well as by England and the United States. See Moore, International Law Digest, Vol. 2, 287, 297; Fiore, International Law Codified, translated by E. M. Borchard, 192, 193; Wheaton, International Law, Vol. I, 245; Hall, International Law, 8th ed. 253–258; Jessup, The Law of Territorial Waters, 144–193.

In view of the wide recognition of this principle of extra-territorial jurisdiction over crimes committed on merchant vessels and its explicit adoption in *United States* v. *Rodgers, supra,* we cannot say that the language of the present statute punishing offenses on United States vessels out of the jurisdiction of a State, " when committed within the admiralty and maritime jurisdiction of the United States," was not intended to give effect to it. If the meaning of the statute were doubtful, the doubt would be resolved by the report on these sections by the Special Joint Committee on the Revision of the Laws, 60th Congress, 1st Sess., Rep. 10, part 1, p. 10, in which it was pointed out that the jurisdiction extends to vessels of the United States when on navigable waters within the limits of a foreign state, and " all cases arising on board such vessels while on any such waters, are clearly cases within the admiralty and maritime jurisdiction of the United States."

A related but different question, not presented here, may arise when jurisdiction over an offense committed on a foreign vessel is asserted by the sovereignty in whose waters it was lying at the time of its commission, since for some purposes the jurisdiction may be regarded as concurrent, in that the courts of either sovereignty may try the offense.

158

There is not entire agreement among nations or the writers on international law as to which sovereignty should yield to the other when the jurisdiction is asserted by both. See Jessup, the Law of Territorial Waters, 144–193. The position of the United States, exemplified in *Wildenhus's Case,* 120 U. S. 1, has been that at least in the case of major crimes, affecting the peace and tranquility of the port, the jurisdiction asserted by the sovereignty of the port must prevail over that of the vessel. In that case the Belgian Consul sought release on habeas corpus of Wildenhus, a seaman, who was held in a New Jersey jail on a charge of homicide committed on a Belgian vessel lying in New Jersey waters, on the ground that Article XI of the Convention between Belgium and the United States of March 9, 1880, 21 Stat. 781, gave consular officers of the sovereignty of the vessel sole cognizance of offenses on board ship, except those of a nature to disturb the tranquillity and public order on shore and those involving a person not belonging to the crew. The court construed the Convention as inapplicable to the crime of murder and upheld the jurisdiction of the local court as conforming to the principles of international law. It said, p. 12:

"And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority."

This doctrine does not impinge on that laid down in *United States* v. *Rodgers, supra,* that the United States may define and punish offenses committed by its own citizens on its own vessels while within foreign waters where the local sovereign has not asserted its jurisdiction.[10] In the absence of any controlling treaty provision, and any assertion of jurisdiction by the territorial sovereign, it is the duty of the courts of the United States to apply to offenses committed by its citizens on vessels flying its flag, its own statutes, interpreted in the light of recognized principles of international law. So applied the indictment here sufficiently charges an offense within the admiralty and maritime jurisdiction of the United States and the judgment below must be

*Reversed.*

---

[10] That the doctrines are not in conflict was pointed out by Webster in his letter to Lord Ashburton, quoted *supra* note 9.   See also Hall, International Law, 8th ed., 255–256.