### UNITED STATES v. 12536 GROSS TONS OF WHALE OIL EX THE CHARLES RACINE.

No. 6332.

District Court, E. D. Virginia, Norfolk Division.

Feb. 9, 1939.

H. H. Holt, Jr., Asst. Dist. Atty., of Norfolk, Va., and Allan D. Jones and J. Frank Staley, Sp. Assts. to Atty. Gen., for the United States.

Robert M. Hughes, Jr. (of Hughes, Little & Seawell), of Norfolk, Va., and George DeForest Lord, John D. Garrison, and Joseph W. Wyatt, all of New York City, for respondent.

WAY, District Judge.

The sole question of law presented for decision in this cause is whether the transportation of the whale oil by the Norwegian ship "Charles Racine", a ship not "built in and documented under the laws of the United States and owned by persons who are citizens of the United States" was a violation of Section 27 of the Merchant Marine Act of 1920, 41 Stat. 999, as amended, 49 Stat. 154, 442, 46 U.S.C.A. § 883, and subjected 'said cargo to forfeiture under the provisions of said act; or, more concisely stated, whether such transportation was, in the language of said act, "between points in the United States." Section 27, footnote[1].

On behalf of Libellant it is said that the laws of the United States confine all domestic commerce to our vessels; that, since the whale oil was the product of an American fishery, it was in fact already in our commerce at the time it was transferred to the "Charles Racine" and was not introduced therein through a foreign bottom as from a foreign country; that the "Ulysses" being at all times in navigable waters, remained in the admiralty and maritime jurisdiction of the United States, and that since the cargo had both its origin and destination within such jurisdiction the commerce was necessarily domestic, and therefore within the inhibition of the act.

Respondent asserts, in part, that the coastwise laws of the United States cannot properly be construed to mean that an American vessel on the high seas or in foreign territorial waters is a point in the United States. It is admitted that Congress could have made the coastwise laws co-extensive with the admiralty and maritime clause of the constitution, but asserted that Congress has not done so; and that the transportation inhibited by the statute must be within the regional areas of land and water over which the United States claims and exercises jurisdiction and control as a sovereign power. In other words, that the inhibition of the statute does not apply to metaphorical, transitory "points" which, while recognized for certain purposes, are nevertheless dependent upon and follow the movements of our vessels wherever they may on the high seas or in the territorial waters of other nations;

[1] "No merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by section 13 or 808 of this title: Provided, That no vessel having at any time acquired the lawful right to engage in the coastwise trade, either by virtue of having been built in, or documented under the laws of the United States, and later sold foreign in whole or in part, or placed under foreign registry, shall hereafter acquire the right to engage in the coastwise trade: Provided further, That this section shall not apply to merchandise transported between points within the continental United States, excluding Alaska, over through routes heretofore or hereafter recognized by the Interstate Commerce Commission for which routes rate tariffs have been or shall hereafter be filed with said Commission when such routes are in part over Canadian rail lines and their own or other connecting water facilities: Provided further, That this section shall not become effective upon the Yukon River until the Alaska Railroad shall be completed and the Shipping Board shall find that proper facilities will be furnished for transportation by persons citizens of the United States for properly handling the traffic: Provided further, That this section shall not apply to the transportation of merchandise loaded on railroad cars or to motor vehicles with or without trailers, and with their passengers or contents when accompanied by the operator thereof, when such railroad cars or motor vehicles are transported in any railroad car ferry operated between fixed termini on the Great Lakes as a part of a rail route, if such car ferry is owned by a common carrier by water and operated as part of a rail route with the approval of the Interstate Commerce Commission, and if the stock of such common carrier by water, or its predecessor, was owned or controlled by a common carrier by rail prior to June 5, 1920, and if the stock of the common carrier owning such car ferry is, with the approval of the Interstate Commerce Commission, now owned or controlled by any common carrier by rail and if such car ferry is built and documented under the laws of the United States."

that "points" is employed in the statute in a permanent, physical, regional sense only.

Counsel for the United States cite, among others, the following authorities:

United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086. There the defendant challenged the jurisdiction of the District Court for the Eastern District of Pennsylvania, to hear an indictment for a crime alleged to have been committed by Flores on one of our merchant vessels while the vessel was at anchor in a port in the Belgian Congo, about 250 miles inland. The statutes upon which the indictment was based, read as follows: "First. When committed upon the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, or when committed within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State on board any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, or District thereof. * * *" 289 U.S. at page 145, 53 S.Ct. at page 581, 77 L.Ed. 1086.

And R.S. § 730, 28 U.S.C.A. § 102: "The trial of all offenses committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

With respect to the contention that the jurisdiction of the United States to punish crimes was based upon the territorial principle, the Court said: "The appellee insists that even though Congress has power to define and punish crimes on American vessels in foreign waters, it has not done so by the present statute, since the criminal jurisdiction of the United States is based upon the territorial principle and the statute cannot rightly be interpreted to be a departure from that principle. But the language of the statute making it applicable to offenses committed on an American vessel outside the jurisdiction of a state 'within the admiralty and maritime jurisdiction of the United States' is broad enough to include crimes in the territorial waters of a foreign sovereignty. For Congress, by incorporating in the statute the very language of the constitutional grant of power, has made its exercise of the power coextensive with the grant. Compare The

Hine v. Trevor, 4 Wall. 555, 18 L.Ed. 451." 289 U.S. at page 155, 53 S.Ct. at page 584, 77 L.Ed. 1086.

United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 113, 37 L.Ed. 1071. Rodgers was indicted in the district court for the Eastern District of Michigan for an assault alleged to have been committed with a dangerous weapon, on board an American vessel not within the jurisdiction of any particular state, but in a part of the Detroit river within the territorial limits of the Dominion of Canada. The statute upon which that indictment was founded reads as follows: "Sec. 5346. Every person who, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty jurisdiction of the United States, and out of the jurisdiction of any particular State, on board any vessel belonging in whole or part to the United States, or any citizen thereof, with a dangerous weapon, or with intent to perpetrate any felony, commits an assault on another shall be punished by a fine of not more than three thousand dollars, and by imprisonment at hard labor not more than three years."

The defendant was taken by the vessel to Detroit. Section 730 of the Revised Statute, 28 U.S.C.A. § 102, specifying the place of trial in such cases was then in force. The Court said: "The admiralty jurisdiction of the country of the owners of the steamer upon which the offense charged was committed is not denied. They being citizens of the United States, and the steamer being upon navigable waters, it is deemed to be within the admiralty jurisdiction of the United States. It was therefore perfectly competent for congress to enact that parties on board, committing an assault with a dangerous weapon, should be punished, when brought within the jurisdiction of the district court of the United States."

The principle upon which Libellant mainly bases its contention for the right to forfeit the cargo is stated in Crapo v. Kelly, 16 Wall. 610, 624, 83 U.S. 610, 21 L.Ed. 430:

"The rule is thus laid down by Mr. Wheaton in his treatise on International Law * * *: 'Both the public and private vessels of every nation on the high seas, and out of the territorial limits of any other state, are subject to the jurisdiction of the state to which they belong. Vattel says that the domain of a nation

extends to all its just possessions, and by its possessions we are not to understand its territory only, but all the rights it enjoys. And he also considers the vessels of a nation on the high seas as portions of its territory. Grotius holds that sovereignty may be acquired over a portion of the sea.' As an illustration of the proposition that the ship is a portion of the territory of the state, the author proceeds: 'Every state has an incontestable right to the service of all its members in the national defense, but it can give effect to this right only by lawful means. Its right to reclaim the military service of its citizens can be exercised only within its own territory, or in some place not subject to the jurisdiction of any other nation. The ocean is such a place, and any state may unquestionably there exercise, on board its own vessels, its right of compelling the military or naval services of its subjects.'

"Chancellor Kent, in his Commentaries * * * says: 'The high seas are free and open to all the world, and the laws of every state or nation have there a full and perfect operation upon the persons and property of the citizens or subjects of such a state or Nation.' 'No nation has any right or jurisdiction at sea, except it be over the persons of its subjects, in its own public and private vessels; and so far territorial jurisdiction may be conceded as preserved, for the vessels of a nation are in many respects considered as portions of its territory and persons on board are protected and governed by the law of the country to which the vessel belongs.'

"Wharton * * * says: 'A ship in the open sea is regarded by the law of nations as a part of the territory whose flag such ship carries.' 'By this (he says) may be explained several cases quoted as establishing the lex domicilii, though they are only sustainable on the ground that the ship at sea is part of the territory whose flag she bears. * * * In respect to principle, ships at sea and the property in them, must be viewed as part of the country to which they belong.' "

Also, Wilson v. McNamee, 102 U.S. 572, 26 L.Ed. 234; The Hamilton, 207 U.S. 398, 405, 28 S.Ct. 133, 52 L.Ed. 264; In re Ah Sing, C.C., 13 F. 286; 4 Benedict Admiralty Sec. 4; Fisher v. Fisher, 1929 A.M. C. 659, 250 N.Y. 313, 165 N.E. 460, 61 A.L.R. 1523, validity of a marriage of American citizens solemnized on an American merchant ship while on the high seas.

Some of the decisions relied on by Respondent are: Cunard S. S. Co. v. Mellon, 262 U.S. 100, 101, 43 S.Ct. 504, 507, 67 L.Ed. 894, 27 A.L.R. 1306. The court there construed the language "the United States and all territory subject to the jurisdiction thereof", contained in the 18th Amendment to the constitution U.S.C.A. The Government sought to have the amendment and the statutes enacted pursuant thereto so construed as to prohibit any domestic ship even without the territorial waters of the United States from carrying thereon intoxicating liquors for beverage purposes either as cargo or sea stores, and also to prohibit foreign vessels bringing into our territorial waters or carrying while therein, such liquors either as cargo or sea stores. In disposing of the two contentions the court said:

"Various meanings are sought to be attributed to the term 'territory' in the phrase 'the United States and all territory subject to the jurisdiction thereof.' We are of opinion that it means the regional areas—of land and adjacent waters—over which the United States claims and exercises dominion and control as a sovereign power. The immediate context and the purport of the entire section show that the term is used in a physical and not a metaphorical sense—that it refers to areas or districts having fixity of location and recognized boundaries. See United States v. Bevans, 3 Wheat. 336, 390, 4 L.Ed. 404.
* * *

"The defendants contend that the amendment also covers domestic merchant ships outside the waters of the United States, whether on the high seas or in foreign waters. But it does not say so, and what it does say shows, as we have indicated, that it is confined to the physical territory of the United States. In support of their contention the defendants refer to the statement sometimes made that a merchant ship is a part of the territory of the country whose flag she flies. But this, as has been aptly observed, is a figure of speech, a metaphor. Scharrenberg v. Dollar S. S. Co., 245 U.S. 122, 127, 38 S.Ct. 28, 62 L.Ed. 189; In re Ross, 140 U.S. 453, 464, 11 S.Ct. 897, 35 L.Ed. 581; 1 Moore International Law Digest, § 174; Westlake, International Law, 2d Ed., p. 264; Hall, International Law, 7th Ed. (Higgins), § 76; Manning, Law of Nations (Amos), p. 276; Piggott Nationality, pt. II, p. 13. The jurisdiction which it is intended to describe

arises out of the nationality of the ship, as established by her domicile, registry and use of the flag, and partakes more of the characteristics of personal than of territorial sovereignty. See The Hamilton, 207 U.S. 398, 403, 28 S.Ct. 133, 52 L.Ed. 264; American Banana Co. v. United Fruit Co., 213 U.S. 347, 355, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; 1 Oppenheim International Law, 3d Ed., §§ 123-125, 128. It is chiefly applicable to ships on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign. * * *

"The defendants further contend that the amendment covers foreign merchant ships when within the territorial waters of the United States. Of course, if it were true that a ship is a part of the territory of the country whose flag she carries, the contention would fail. But, as that is a fiction, we think the contention is right.

"The merchant ship of one country voluntarily entering the territorial limits of another subjects herself to the jurisdiction of the latter. The jurisdiction attaches in virtue of her presence, just as with other objects within those limits. During her stay she is entitled to the protection of the laws of that place and correlatively is bound to yield obedience to them. Of course, the local sovereign may out of considerations of public policy choose to forego the exertion of its jurisdiction or to exert the same in only a limited way, but this is a matter resting solely in its discretion.
* * *

"Examining the act as a whole, we think it shows very plainly, first, that it is intended to be operative throughout the territorial limits of the United States, with the single exception stated in the Canal Zone provision; secondly, that it is not intended to apply to domestic vessels when outside the territorial waters of the United States; and, thirdly, that it is intended to apply to all merchant vessels, whether foreign or domestic, when within those waters, save as the Panama Canal Zone exception provides otherwise.

"In so saying we do not mean to imply that Congress is without power to regulate the conduct of domestic merchant ships when on the high seas, or to exert such control over them when in foreign waters as may be affirmatively or tacitly permitted by the territorial sovereign; for it long

has been settled that Congress does have such power over them. Lord v. Goodall, N. & P. Steamship Co., 102 U.S. 541, 26 L.Ed. 224; The Abby Dodge v. United States, 223 U.S. 166, 176, 32 S.Ct. 310, 56 L.Ed. 390. But we do mean that the National Prohibition Act discloses that it is intended only to enforce the Eighteenth Amendment and limits its field of operation, like that of the amendment, to the territorial limits of the United States."

Scharrenberg v. Dollar S. S. Co., 245 U.S. 122, 38 S.Ct. 28, 29, 62 L.Ed. 189. An act of Congress prohibited assisting or encouraging the importation or migration of "contract laborers" into the United States. A Chinese seaman was taken aboard a British vessel at Shanghai and brought to San Francisco, there to sign on an American vessel engaged in foreign commerce, the seaman to be finally discharged at Shanghai. One of the contentions made was that the American ship on which the Chinese seaman was to be taken at San Francisco was a part of the territory of the United ·States. With respect to that contention, the court said: "Equally unallowable is the contention that a ship of American registry engaged in foreign commerce is a part of the territory of the United States in such a sense that men employed on it can be said to be laboring 'in the United States' or 'performing labor in this country.' It is, of course, true that for the purposes of jurisdiction a ship, even on the high seas, is often said to be a part of the territory of the nation. whose flag it flies. But in the physical sense this expression is obviously figurative (International Law Digest, Moore, vol. I, § 174), and to expand the doctrine to the extent of treating seamen employed on such a ship as working in the country of its registry is quite impossible. Thus the seamen employed on the Mackinaw were not within either the spirit or the letter of the law on which the petitioner bases his action and in any point of view his contention is fanciful and unsound and must be denied."

In United States ex rel. Claussen v. Day, Commissioner of Immigration, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758, a deportation case, the Court said: "Section 1 [8 U.S.C.A.§ 173] provides that 'United States,' as used in the act, shall be construed to mean the United States and any waters, territory or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone. An entry into the Unit-

ed States is not effected by embarking on an American vessel in a foreign port. Such a vessel outside the United States whether on the high seas or in foreign waters is not a place included within the United States as defined by the Act. See Cunard S. S. Co. v. Mellon, 262 U.S. 100, 122, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; Scharrenberg v. Dollar S. S. Co., 245 U.S. 122, 127, 38 S.Ct. 28 (62 L.Ed. 189)."

See United States ex rel. Roovers v. Kessler, District Director of Immigration, 5 Cir., 90 F.2d 327, citing and following United States ex rel. Claussen v. Day, supra.

In Lam Mow v. Nagle, Com'r, 9 Cir., 24 F.2d 316, 317, it was held that a child of Chinese parents, born on an American vessel on the high seas, the parents being subjects of China but domiciled in the United States, was not born in the United States within the scope of section 1 of Article 14 of the Amendments to the Constitution, U.S.C.A. which provides that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." The court said: "Undoubtedly petitioner's theory that a merchant ship is to be considered a part of the territory of the country under whose flag she sails finds a measure of support in statements made in some of the decided cases and in texts upon international law. But no one of the decisions brought to our attention involved the precise question here presented, and the general statement, or its equivalent, that a vessel upon the high seas is deemed to be a part of the territory of the nation whose flag she flies, must be understood as having a qualified or figurative meaning. Manifestly in a physical sense that must be true. In view of recent decisions of the Supreme Court, elaboration upon this point is thought to be unnecessary. Scharrenberg v. Dollar S. S. Co., 245 U.S. 122, 127, 38 S.Ct. 28, 62 L.Ed. 189; Cunard S. S. Co. v. Mellon, 262 U.S. 100, 122, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306."

■ Section 27 considered as a whole in the light of the foregoing decisions, indicates clearly, it seems to me, that the language "between points in the United States" refers to definite, fixed and permanent physical places, points or locations. There is a marked absence of evidence in the statute showing that the intention of

Congress was to include in the inhibition such constantly changing and figurative points or places as our ships on the high seas and in the territorial waters of other nations. In the cases where it has been held that Congress intended to include American vessels on the high seas and in the territorial waters of other nations, as in United States v. Flores, and United States v. Rodgers, supra, the language of the act of Congress in each instance was co-extensive with the admiralty and maritime clause of the constitution, and by express, clear and definite language included such vessels. On the other hand, where the constitutional provisions and statutes relied on did not in express language include such vessels the Supreme Court held that operation of the statute was confined to the areas of land and water over which the United States claims and exercises dominion and control as a sovereign power, as in Cunard S. S. Co. v. Mellon, and United States ex rel Claussen v. Day, supra.

■ As already observed, there is a lack of language in Section 27, which either expressly or by implication, includes in its inhibition, our ships on the high seas or in the territorial waters of other nations. I think also that there is much in the statute which negatives such intention. For example, "points" in the language of the act, includes, "Districts, Territories and possessions embraced within the coastwise laws". While some of the "possessions" of the United States are expressly omitted from the jurisdiction of the coastwise laws, clearly all "Districts, Territories, and possessions" referred to therein, whether included or excluded from such jurisdiction are fixed, permanent and regional, not transitory and figurative. Furthermore, the Act by its express terms, does not apply to "points within the continental United States, excluding Alaska", and the Act does not "become effective upon the Yukon River" until the happening of specified events. Nor does the Act apply to specified transportation under certain conditions which is performed partly in the United States and partly in Canada, when such transportation is "in any railroad car ferry operated between *fixed termini on the Great Lakes*". All of these provisions found in Section 27 refer clearly and definitely to established permanent districts, territories, possessions, places, areas or regions only, strongly indicating it would appear, that

Congress did not intend to include as "points" in the inhibition of the statute the constantly changing positions of our vessels on the high seas and in the territorial waters of other nations.

This conclusion is not in conflict with rulings made by the Commissioner of Customs in construing this or similar acts of Congress, although such rulings have not been very numerous or entirely uniform. In 1931, representatives of an American factory ship then engaged in processing whales in the Antarctic requested a ruling in advance. The Commissioner replied, in part, as follows:

"In your letter you refer to the Department's ruling, T.D. 43988, that fish brought into the United States in foreign vessels is subject to duty, notwithstanding it is not imported from any foreign country and you suggest that the case in which you are interested differs from that cited in that the question presented in T.D. 43988 was the classification of fish 'taken' by foreign vessels.

"The Bureau is of the opinion that whale oil manufactured on an American vessel from whales taken in the high seas becomes an American product and that such product is not dutiable whether brought into ports of the United States by an American or a foreign vessel. As was said by Judge Story in United States v. Burdett (24 Fed.Cas. [No.] 14684 [p. 1300]), 'Whether the oil is foreign or not depends upon the character of the vessel and the voyage at the time the whales were caught and the oil manufactured and not any subsequent events. * * * It can make no difference in the original character that it has come into port in another vessel.'

"In view of the ruling in the above-mentioned case, the Bureau believes that the oil now contained in the tanks of the American factory ship 'Frango' may be transported to a port in the United States by the Norwegian oil tanker on the ground that the coastwise laws of the United States do not apply to the territory in which the steamship 'Frango' is now operating."

A similar ruling was made in August, 1935, ˙ the Acting Commissioner from which the following is quoted:

"This subject has been before the Bureau before, and it was held that the oil would be exempt from duty. The whole matter has been carefully reviewed in view of your request for an affirmation of the earlier rulings, and after careful consideration this office is of the opinion that the oil would be entitled to free entry only if the foreign 'killer' ships are actually in the employment of the master or owner of the factory ship in the relationship of master and servant, so that the oil might properly be considered a product of an American fishery entitled to free entry under paragraph 1730(a) of the Tariff Act of 1930, 19 U.S.C.A. § 1201, par. 1730(a).

"The Bureau is now of the opinion that it erred in its previous rulings, holding that the oil produced on an American vessel and brought directly to the United States should be treated as merchandise shipped from one port to another in the United States."

What was said in United States v. Two Hundred and Fifty Kegs of Nails, 9 Cir., 61 F. 410, 411, with respect to the failure of an Act of Congress to include a certain class of cases in its inhibition, seems pertinent here:

"It was the intention of congress, by this act, to protect American shipping. It was evidently not considered necessary to extend the protection further than the words of the statute indicate. It was not contemplated that American shipping, in carrying goods between domestic ports, would ever be put to the strain of competition with foreign bottoms by transportation in the circuitous method disclosed in this case. The protection of the statute goes no further than the words, in their plain, obvious sense, indicate. Shippers of merchandise are still left free to transport goods from New York to Redondo by sea in any method they see fit, provided they do not ship them direct from the one port to the other in the prohibited vessel. The protection of the statute was intended to be limited, and the court has not the right to extend it further than to the transportation precisely described in the terms of the statute.

"But it is urged that the facts disclosed in this case amount to a palpable evasion of the statute, and that such is admitted to have been the intention of the parties to the transaction. The purpose the parties had in view can make no difference with the interpretation of the statute. They practiced no concealment or fraud upon the government. Their acts were done openly. They had the statute before them for their guidance. The unlawful act there defined

was malum prohibitum only. The statute left them free to ship goods from New York to Redondo in any manner they saw fit, save and except the manner therein prohibited. They followed a method not mentioned in the statute. They had the right to assume that the whole intention of Congress had been expressed in the words of the statute."

From the foregoing the Court concludes as a matter of law that the transportation by the Norwegian vessel, "Charles Racine", of the cargo of whale oil from the American factory ship "Ulysses", in Shark Bay, in the territorial waters of West Australia, to Norfolk, Virginia, was not a violation of Section 27 of the Act of June 5, 1920, as amended, 41 Stat. 999, 49 Stat. 154, 442, 46 U.S.C.A. § 883, and that the libel should be dismissed.