149 F.Supp. 513 (1956)
Matter of the Petition of E. H. KELLER for Exoneration from or limitation of Liability as Owner of THE JOSEPHINE F.
Anson MASE, Plaintiff,
v.
E. H. KELLER, Defendant.
Civ. A. Nos. 5221, 5180.
United States District Court D. Minnesota, Fourth Division.
August 17, 1956.
*514 William E. Crowder and Thomson & Williams, Minneapolis, Minn., for plaintiff, Anson Mase.
David W. Nord and Meagher, Geer, Markham & Anderson, Minneapolis, Minn., for defendant, E. H. Keller.
NORDBYE, Chief Judge.
Plaintiff, Anson Mase, originally commenced an action against E. H. Keller before the Hennepin County District Court based upon common law negligence alleging injuries to him incurred as the result of an explosion of the Josephine F. during a fishing expedition on Lake Nipigon in September, 1954, when the boat sank to the bottom of the lake. Subsequent to the institution of that suit, defendant removed the matter to this Court alleging admiralty and maritime jurisdiction here. After that proceeding was at issue, defendant, E. H. Keller, commenced a proceeding in admiralty in this Court (Civil Action No. 5221) under Sections 183-189, 46 United States Code Annotated, in which he petitioned this Court for exoneration from or limitation of his liability growing out of the explosion which occurred on the Josephine F. alleging that the occurrence was without his personal fault, privity, or knowledge. Apparently proceedings under Sections 183-189, 46 United States Code Annotated, and Admiralty Rule 51, 28 U.S.C.A., were followed strictly by Keller, but neither plaintiff Mase nor his counsel, nor any other claimant filed any claims or appearance before this Court in that proceeding. In that matter after the hearing of evidence, a decree was entered on December 20, 1955, in favor of E. H. Keller. On May 8, 1956, plaintiff Mase brought this motion contending, among other things, that he failed to appear in Civil Action No. 5221 because of excusable neglect, believing that his institution of the proceeding in Civil Action No. 5180 was notice of his appearance under Sections 183-189, 46 United States Code Annotated, and he now seeks to have the default judgment in Civil Action No. 5221 set aside and permission granted him to appear therein by reason of his alleged excusable neglect. He also seeks to have the limitation of liability proceedings dismissed by reason of the fact that the Court did not have jurisdiction over the subject matter or of the parties. There is no diversity of citizenship.
At the outset, it would seem that Admiralty Rule 39, 28 United States Code Annotated, which requires that a motion to open a default decree must be made within 60 days after the decree has been entered, presents an insurmountable obstacle to the granting of relief by way of reopening the default decree. The Federal Rules of Civil Procedure do not apply in admiralty. In any event, in that the Court concludes that admiralty jurisdiction does not lie in this Court, the question of reopening the default decree becomes moot, and in that jurisdiction of this Court in Civil Action No. 5180, as well as Civil Action No. 5221, is bottomed upon admiralty, it is deemed advisable to issue this order as applicable *515 to each of these proceedings. The showing made herein as to the jurisdiction of this Court is presented by way of affidavits by Canadian residents and maps of the area involved.
Lake Nipigon lies wholly within the Province of Ontario, Canada. It is connected with Lake Superior by the Nipigon River, which rises from the waters of Lake Nipigon. This river flows from its source at the southeasterly shore of that lake in a southerly direction approximately 35 miles before it empties itself into Nipigon Bay in the Canadian waters of Lake Superior. Its mouth is some 45 miles from the American waters of Lake Superior. There is no history whatsoever in the showing before this Court of any commerce at any time over this river between Canada and the United States. However, there is now, and always has been, an abundance of water in the river, but the history of its navigability would indicate that it has been primarily a water highway for fur traders in light canoes and boats and the utilization thereof for the floating of logs and pulpwood. The numerous and long portages and swift waters always limited its use in the early days for such particular purposes. As one proceeds northward from Lake Superior, there is a span in the river of about 12 miles until one comes to Cameron Falls. There, the water is rapid and exceedingly turbulent, causing the early voyageurs on the river to portage some 2 miles. However, at the present time, two huge power dams are constructed there, which render the river completely impassable for any water transportation, except certain sluices have been constructed for the purpose of conveying logs which come down the river. After Cameron Falls, the water is suitable again for navigation by canoes and boats, with obstacles of rapids and fast water, for about 12 miles until Pine Portage is reached. Here, rough rapids are again encountered, which always have necessitated portaging for a stretch of about one and one-half miles. It is to be gathered from the showing made that the river now is obstructed at this point by what is termed the Pine Portage Power Development. Above Pine Portage, the river is suitable for navigation for canoes or small boats, with difficult portages, however, until Virgin Falls is reached. This point on the river is close to its source. Here is encountered turbulent water and rugged rapids. A power dam which now has been constructed at this point completely obstructs navigation by any water craft. These power dams have been in existence since about 1912. In addition, the river has many other obstructions to use by boats, such as Splitrock Portage, Island Portage, White Chutes Portage, Little Flatrock Portage, Victoria Rapids, Devil Rapids, Rabbit Rapids, Miners Rapids, and others. Hence, it will be observed that, when the accident happened to the Josephine F. in 1954, and as of this time, the Nipigon River has two primary uses  one for the generation of electric power and the other for the driving of logs or pulpwood for Canadian pulp and lumber companies. There is no showing that any of the logs or pulpwood are carried or transported into any American waters. In prior years, no doubt a brisk fur trade was carried on in the north country down the Nipigon River to Canadian Lake Superior by Indian trappers and the representatives of the Hudson Bay Company. But, again the showing does not indicate that this trade extended to the United States. There is some evidence that some type of craft now ply on certain stretches of the water in the Nipigon River, but they are stationed and move in the stretches of open water of the river in aid of the logging and pulpwood drives thereon.
Basically, admiralty jurisdiction was reserved in the Constitution for the judicial power of the United States in order to avoid burdens which might be imposed by the Legislatures of the various States through which navigable waters of the United States might course. However, admiralty and maritime jurisdiction also extends to commerce on the high seas and waters used in connection therewith. The old doctrine that admiralty *516 jurisdiction is limited in rivers of the United States to the ebb and flow of the tides no longer applies. And from a reading of the pertinent decisions of the United States Courts, it would seem that rivers connected with the Great Lakes, for instance, even though lying in the Dominion of Canada, which are navigable in fact and highways of commerce, may come within the Constitutional grant of admiralty. Perhaps the most quoted criterion of navigability in the Constitutional concept as to American rivers is to be found in The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999, wherein the Supreme Court stated,
"* * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."
If one assumes to apply literally the above language to the showing made herein as to the navigability of the Nipigon River in Canada, it may be argued that, before the dams were constructed in this river, it would be considered a navigable river were it within the confines of the United States and a continuous water highway between the States. Here, however, we are not dealing with a "continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." The Daniel Ball, supra. The Nipigon River is not water in or of the United States. Commerce never has been carried on over this highway with the United States in the past, and obviously by reason of the dams now constructed, commerce never will be carried on the river with the United States in the future.
In considering the question of navigability, it would seem that courts must be realistic and not substitute fiction for reality if admiralty jurisdiction is to be invoked. The Constitutional concept of navigability as to American waters should not be extended to foreign waters in absence of a showing that the foreign waters are actually an artery of water commerce with the high seas or the Great Lakes. Otherwise, the jurisdiction of the United States Courts in admiralty would prevail on foreign waters wholly unrelated to commerce with the United States. For instance, if admiralty jurisdiction were sustained under the present showing, then a tort committed on a craft plying on Lake Winnipeg, Canada, which connects with the Red River of the north, a river rising within the confines of the United States, likewise would be considered within the admiralty jurisdiction of the United States Courts in the event jurisdiction of the parties was obtained. Moreover, if there was a negligent tipping over of a canoe on any of the myriad streams and lakes in northern Canada remotely connected with the Pigeon River, a well-known highway for the voyageurs of old which flows between Minnesota and Canada, it likewise could be argued that such tort would come within the admiralty jurisdiction of the courts of this country if jurisdiction was obtained over the parties. Such a conception of admiralty jurisdiction of the United States Courts seems absurd.
The showing here does not disclose that there has been any boat travel between the waters of the United States and Lake Nipigon. It would be impossible, for instance, for the Josephine F., or any United States craft, to cruise *517 from the waters of this country to the place where the accident happened. The only means of transportation of the Josephine F. from the United States to Lake Nipigon would be by way of railroad or truck. A liberal interpretation of the facts touching upon navigability of a stream or river lying within the borders of the United States under the Commerce Clause of the Constitution, for instance, which is designed to protect and safeguard the public rights of the people, may well be countenanced, and justly so, by the courts, although the test of navigability under the Commerce Clause is presumably the same as the test under admiralty jurisdiction. But to hold that a river wholly within the Dominion of Canada, which never has been used as an artery of commerce with the United States and never will be susceptible of such use in the future, seems bereft of any sound and persuasive reasoning. In fact, it seems incongruous to indulge in the concept of admiralty jurisdiction in the Constitutional sense with reference to such a waterway, which never has been used as a highway of commerce with the United States and lying wholly within the confines of a foreign country.
The Court cannot speculate as to what may happen to the Nipigon River in the future, or what improvements may be made by the Dominion of Canada. There is not the slightest indication in the record that Canada intends to improve the Nipigon River by any system of locks whereby the obstacles to navigation will be removed in the future, and although in a sense it may be reasoned that this river was navigable when canoes and light craft were used by those who were willing to undergo the hardship of long portages, nevertheless the Court now is confronted with the undeniable fact that the river never was navigable in the sense that it was used as a highway of commerce between Canada and the United States. And from the showing herein, it seems idle to speculate as to its being susceptible for such navigation in the future. Certainly, it could not have been within the intent of the framers of the Constitution in conferring admiralty jurisdiction upon the judicial branch of the Federal Government to extend such jurisdiction with reference to the waters of Lake Nipigon, which, so far as navigation with the United States is concerned, has the same status as a land-locked lake located in a foreign country. And the mere fact that some of the courts of Canada may have followed the United States Courts as to the tests of navigability, such decisions cannot be utilized for the purpose of broadening or extending the jurisdiction of the United States Courts in admiralty to Canadian waters. See Keewatin Power Co. v. Town of Kenora and Hudson's Bay Co. v. Town of Kenora, Vol. 13, Ontario Law Reports, 237.
The Court has considered all of the available cases to which it has been referred. Some of them, of course, arise under the Commerce Act rather than under the admiralty clause of the Constitution. However, none of these cases have intimated that a river in a foreign land, which is not now navigable in fact and which never has been used as a highway of commerce between the United States and the foreign country and never will be susceptible of such commerce, can be considered as a navigable river within the Constitutional concept of admiralty jurisdiction. The Propeller Genesee Chief v. Fitzhugh, 12 How. 443, 13 L. Ed. 1058; The Eagle, 8 Wall. 15, 19 L. Ed. 365; The Montello, 20 Wall. 430, 22 L.Ed. 391; Panama Railroad Co. v. Napier Shipping Co., 166 U.S. 280, 17 S. Ct. 572, 41 L.Ed. 1004; Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847; United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086; United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243; Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 41, 62 S.Ct. 886, 86 L.Ed. 1246; Black Diamond S. S. Corp. v. Robert Stewart & Sons, 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754; Wisconsin *518 Public Service Corp. v. Federal Power Commission, 7 Cir., 147 F.2d 743; State of Wisconsin v. Federal Power Commission, 7 Cir., 214 F.2d 334.
It follows from the foregoing that the Court concludes that it lacks jurisdiction in either of these proceedings, and therefore the matter of the Petition of E. H. Keller, Civil Action No. 5221, is dismissed for lack of jurisdiction, and the action entitled Anson Mase v. E. H. Keller, Civil Action No. 5180, is remanded for the same reason to the Hennepin County District Court from whence it came. It is so ordered. An exception is allowed.