**SOCIEDAD NACIONAL DE MARINER-
OS DE HONDURAS, Plaintiff,**

v.

**Frank W. McCULLOCH, Chairman, and
Philip Ray Rodgers, Boyd Leedom, John
H. Fanning, and Gerald A. Brown, Mem-
bers, National Labor Relations Board,
Defendants.**

**Civ. A. No. 4020–61.**

United States District Court
District of Columbia.
Jan. 18, 1962.

Herzel H. E. Plaine, Charles S. Rhyne and Brice W. Rhyne, Washington, D. C., for plaintiff.

Stuart Rothman, Gen. Counsel, Marcel Mallett-Prevost and Norton J. Come, Assts. Gen. Counsel, for National Labor Relations Board, Washington, D. C., for defendants.

H. Howard Ostrin, New York City, for intervenor National Maritime Union of America, AFL-CIO.

HOLTZOFF, District Judge.

The question presented in this case is whether the National Labor Relations Board has authority to order that an election for the designation of representatives for the purposes of collective bargaining, be held among foreign seamen employed on foreign merchant ships that have occasion to visit American ports and that are owned by a foreign corporation that is a subsidiary of an American corporation.

The National Labor Relations Board, on November 15, 1961, rendered a decision and issued a direction that an election be conducted among seamen employed on certain vessels flying the flag of Honduras and owned by a Honduran corporation, the name of which is Empresa Hondurena de Vapores, S. A., generally known as Empresa, and which is a subsidiary of the United Fruit Company, an American corporation. The purpose of the election was to determine whether these seamen desired to be represented for purposes of collective bargaining by the National Maritime Union of America AFL-CIO, or by a Honduran labor union briefly known as "Sindimar", or by neither. The plaintiff, Sociedad Nacional de Marineros de Honduras, is a Honduran labor union and the bargaining agent of these seamen under the laws of Honduras. The name of the plaintiff was not to be placed on the ballot at the prospective election.

On December 16, 1961 the plaintiff brought this action against the members of the Board to enjoin and restrain them from conducting the election on the ground that in ordering it, the Board had exceeded its legal authority. A temporary restraining order was issued on the same day. A hearing was held on December 20, 1961. The National Maritime Union of America, AFL-CIO, was granted leave to intervene as a defendant, since it had been a party to the proceeding before the Board. A motion for a preliminary injunction and a motion by the defendants to dismiss the complaint for failure to state a claim upon which relief can be granted were heard at length. A decision on these two motions was reserved in order to accord to the Department of Justice an opportunity to submit a statement as to its attitude and as to the position of the Department of State concerning the matter.[1]

The pertinent facts may be summarized as follows. Empresa is a corporation organized under the laws of Honduras, where it maintains its principal office and place of business. It owns and operates a fleet of seagoing vessels, which are registered under the laws of Honduras and fly the flag of that country. The crews of these ships are composed entirely of citizens of Honduras, with the exception of one person, who is a British subject. All of the seamen are members of a Honduran labor union, which is the plaintiff in this action, and which is briefly known as Sociedad. They were hired in Honduras under shipping articles executed in that country. Sociedad is recognized by the Government of Honduras as the sole collective bargaining agent of these seamen. Collective bargaining agreements are in effect between Empresa and Sociedad. Empresa is a subsidiary of United Fruit Company, a New Jersey corporation. The ships in question make voyages and carry freight between Central and South American ports, as well as between Central and South American ports and ports of the United States.

On November 13, 1959, the National Maritime Union of America, AFL-CIO, filed a petition with the National Labor Relations Board, seeking to represent as a single unit all unlicensed seamen employed on ships owned by various subsidiaries of the United Fruit Company, including Empresa. Statutory authority for maintaining such a proceeding is found in 29 U.S.C.A. § 159(c). The Union claimed that it represented a number of these employees. It does not appear whether the activity of the American Union was instigated by any of the seamen, or whether the Union was interjecting itself on its own initiative.

A series of hearings were conducted before an Examiner and the matter was then considered by the Board. Two years later, on November 15, 1961, the Board rendered a decision, in effect, granting the prayer of the petition and ordering an election, as has already been stated.

1. The complaint is verified on oath and consequently is treated as an affidavit for the purpose of the motion for a preliminary injunction. No answering affidavits have been filed, although memoranda and briefs in opposition have been submitted.

The comprehensive and exhaustive opinion of the Board was substantially predicated on the propositions that the flag or nationality of the vessels should play no role in its determination; that the ships were actually controlled by United Fruit Company as a charterer; that the bulk of the trade conducted by the ships was between Central and South American countries and the United States; and that, consequently, this shipping was essentially that of this nation, and an adjunct of the operations of a domestic corporation in international trade of the United States. It was contemplated that the balloting would take place in part on board each ship when it visited an American port, and in part by mail, i. e. "absentee voting".

Honorable Celeo Davila, Ambassador of Honduras, promptly submitted a formal written protest, dated November 29, 1961, against the decision of the Board, in which he courteously but firmly called attention to the fact that a treaty between Honduras and the United States, signed on November 7, 1927, provided that merchant vessels under the flag of either of the contracting parties, should be deemed to be the vessels of the party whose flag they fly, both within the territorial waters of the other party and on the high seas. He also called attention to some of the other facts that have already been summarized and to certain principles of international law.

At the argument of the motions before this Court, a representative of the Department of Justice was present as an observer. The Court invited him to submit a statement of the views of the Government as to the merits of the Honduran note, and time was accorded for that purpose. Subsequently this Court received a formal communication from Honorable William H. Orrick, Jr., Assistant Attorney General, dated January 10, 1962, the pertinent portions of which read as follows:

"The Department of State informs me that, although the Department does not support all the statements in the Honduran Note, it agrees with the conclusion that jurisdiction of the National Labor Relations Board should not attach in this case.

"We are sending copies of this letter to the counsel of record."

Counsel for the National Labor Relations Board responded by a letter dated January 12, 1962, in which he took issue with the Department of Justice and the Department of State, and adhered to his original position that the Board had acted within the scope of its authority.

This disagreement between counsel for various agencies of the Government complicates the problem before the Court and requires more elaborate and exhaustive discussion than might otherwise be needed. The Attorney General, as the chief legal officer of the Government, through his representatives, indicates that the Department of State is of the opinion that the jurisdiction of the National Labor Relations Board should not attach in this case. It is a reasonable inference that in transmitting the views of the Department of State, the Department of Justice was, in effect, approving or concurring in them. On the other hand, counsel for the National Labor Relations Board, which theoretically is also an agency of the Executive branch of the Government, strikes a dissonant note and seeks to uphold the jurisdiction of the Board. Ordinarily, the Attorney General, through members of his staff, or through the United States Attorney, appears in behalf of the Government. If there are any differences of opinion between Government agencies, they are generally adjusted intramurally, and the definitive position of the Government is presented to the Courts by the Attorney General through his representatives.[2]

---

2. E.g. St. Regis Paper Co. v. United States, 82 S.Ct. 289, decided by the Supreme Court on December 11, 1961. It is stated on page 295 of 82 S.Ct. that the Solicitor General pointed out that the Government agencies were at loggerheads on the problem presented to the Court, but that he had concluded "on balance" to present a specific view.

The anomalous situation presented in the instant case gives rise to some reflections on an interesting and significant development that in recent years has gradually taken place in the fundamental political institutions of this country. It is, of course, elementary that the Founding Fathers contemplated a tripartite division of the Federal Government, consisting of three coordinate branches. Being both profound scholars and practical realists, they derived their ideas in part from political philosophers, principally Montesquieu, and in part from their own actual experience. The advent of the administrative process, which was almost unknown in Anglo-American jurisprudence at the time of the Constitutional Convention, but which has been necessitated by modern social and economic developments, has affected this tripartite division. At times the administrative process is employed by Executive departments and agencies, such as the Department of the Interior, the Department of Agriculture, the Department of Health, Education and Welfare, and others. It is also applied by regulatory Boards and Commissions. Beginning with the Interstate Commerce Commission, which was created in 1887, the number of such establishments has greatly grown. This development was particularly rapid in the years immediately following the great depression.

It was at first assumed that these Boards and Commissions were included entirely within the Executive branch of the Government. The Supreme Court in Humphrey's Executor v. United States, 295 U.S. 602, 629, 55 S.Ct. 869, 79 L.Ed. 1611, however, held that to a considerable extent such regulatory bodies were independent of the Executive. Thus in order to secure their independence, members of such boards and commissions, unlike other appointees of the President, were not subject to removal by the President at will. Mr. Justice Sutherland in his learned and thoughtful treatment of this topic indicated that these agencies were in part quasi-legislative and in part quasi-judicial. It may well be that from the standpoint of political science and constitutional law, we are gradually evolving a Federal government divided into four coordinate branches, instead of three. This is not said in any critical vein, but merely in the interest of clarity of thought. It is entirely possible that the development will prove salutary. The law and political institutions cannot stand still or remain static.

The issue to be decided in this litigation, namely, the status of a merchant ship in a foreign port, lies in a field that has frequently been discussed by the courts as well as by publicists and commentators. These discussions are not always consistent with each other and some of them are difficult to reconcile. For example, there are divergent statements as to whether a merchant ship is a part of the territory of the country whose flag it flies when it is in the territorial waters or a harbor of a foreign country.

In United States v. Rodgers, 150 U.S. 249, 260, 14 S.Ct. 109, 113, 37 L.Ed. 1071, it was stated that as concerns transactions on board merchant ships, the vessels "are deemed to be within the country of their owners. Constructively they constitute a part of the territory of the nation to which the owners belong."

In United States v. Flores, 289 U.S. 137, 155, 53 S.Ct. 580, 77 L.Ed. 1086, Mr. Justice Stone observed that a merchant vessel is deemed to be a part of the territory of the sovereignty whose flag it flies for the purposes of jurisdiction to punish crimes committed on board ship. It does not lose that character when in navigable waters within the territorial limits of another sovereignty.

In Lauritzen v. Larsen, 345 U.S. 571, 584, 73 S.Ct. 921, 97 L.Ed. 1254, Mr. Justice Jackson emphasized the importance of this doctrine in trenchant terms (pp. 584, 585, 73 S.Ct. p. 929):

"Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which

gives cardinal importance to the law of the flag. Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it. Nationality is evidenced to the world by the ship's papers and its flag. The United States has firmly and successfully maintained that the regularity and validity of a registration can be questioned only by the registering state.

"This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because it 'is deemed to be a part of the territory of that sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty.' "

On the other hand, expressions may be found to the effect that it is but a figure of speech to say that a merchant ship is part of the territory of the country whose flag it flies, even when the ship is in the territorial waters or a port of a foreign country.

The leading American decision on this general subject is Wildenhus's Case, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed 565, in which the opinion was written by Mr. Chief Justice Waite. That case involved a homicide committed on board a Belgian merchant ship while it was moored at a dock in Jersey City. It was held in a *habeas corpus* proceeding that the local New Jersey courts had jurisdiction of the crime, although both the culprit and the victim were subjects of Belgium and members of the ship's crew. As some of the statements in the opinion are basic to the topic here discussed, we shall quote from it at some length (pp. 11, 12 and 18, 7 S.Ct. pp. 387 and 390):

"It is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to some different understanding or agreement;

\* \* \* \* \* \*

"From experience, however, it was found long ago that it would be beneficial to commerce if the local government would abstain from interfering with the internal discipline of the ship, and *the general regulation of the rights and duties of the officers and crew towards the vessel or among themselves.*[3] And so by comity it came to be generally understood among civilized nations that all matters of discipline, and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation, or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never, by comity or usage, been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority. Such being the general public law on this subject, treaties and conventions have been entered into by nations having commercial intercourse, the purpose of which was to settle and define the rights and duties of the contracting parties with respect to each other in these particulars, and thus prevent the inconvenience that might arise from attempts to exercise conflicting jurisdiction.

3. Emphasis supplied.

"Disorders which disturb only the peace of the ship or those on board are to be dealt with exclusively by the sovereignty of the home of the ship, but those which disturb the public peace may be suppressed, and, if need be, the offenders punished, by the proper authorities of the local jurisdiction."

To summarize the basic theory, matters relating to the peace of the ship or those on board, are to be dealt with exclusively by the sovereign of the home of the ship, while disturbances of the peace generally may be suppressed and the offenders punished by the local authorities. While this doctrine relates to the enforcement of the criminal law, the same principles would seem to be applicable to civil affairs. Although the principle is clear, it is not always easy or simple to draw the line and to determine on which side any particular transaction may fall.

The converse of the situation presented in Wildenhus's Case, was confronted in two later decisions of the Supreme Court. In Wildenhus's Case a crime committed on board a foreign merchant ship in an American harbor, was deemed punishable by American courts if it disturbed the peace of this country. In United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071, and United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086, it was held that an American seaman committing a crime on board an American ship, while the ship was either in foreign territorial waters or in a foreign harbor, could be brought back to the United States and tried in a Federal court. The first of these two cases applied this doctrine to an assault with a dangerous weapon committed on board an American ship by an American seaman while the ship was proceeding through Detroit River, which was within the territorial waters of Canada. The second went so far as to sustain criminal jurisdiction of a Federal court over a murder of an American citizen by another American citizen aboard an American ship while at anchor in a port in the Belgian Congo. This conclusion was reached in spite of the fact that at the time of the commission of the offense, the ship was attached to the shore by cables at a point two hundred and fifty miles inland from the mouth of the Congo River. Attention has been called to these few decisions in order to indicate the uncertainties of the subject and the vagueness of the limitations on the authority of the United States in respect to foreign merchant ships from the point of view of constitutional and international law, as well as from the standpoint of comity and policy.

It seems proper to commence a consideration of the specific problem that confronts the Court in this case with a reference to the treaty between United States and Honduras "of Friendship, Commerce and Consular Rights", signed on December 7, 1927, and proclaimed on July 23, 1928, 45 Stat. 2618. Article X of the treaty provides as follows (45 Stat. 2625):

"Merchant vessels and other privately owned vessels under the flag of either of the High Contracting Parties, * * * shall, both within the territorial waters of the other High Contracting Party and on the high seas, be deemed to be the vessels of the Party whose flag is flown."

Article XXII, 45 Stat. 2634, provides, in part, as follows:

"A consular officer shall have exclusive jurisdiction over controversies arising out of the internal order of private vessels of his country, and shall alone exercise jurisdiction in cases, wherever arising, between officers and crews, pertaining to the enforcement of discipline on board, provided the vessel and the persons charged with wrongdoing shall have entered a port within his consular district. *Such an officer shall also have jurisdiction over issues concerning the adjustment of wages and the execution of contracts re-*

*lating thereto provided the local laws so permit."* [3]

It may be emphasized that this treaty expressly reserved to the country under whose flag a ship sailed, jurisdiction over adjustment of seamen's wages and contracts relating thereto.

The pertinent statutory provisions that define the power and authority of the National Labor Relations Board are found in the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq. In 29 U.S.C.A. § 159, it is provided that:

"Representatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rate of pay, wages, hours of employment, or other conditions of employment: * * *.

* * * * * *

"(c) (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—

"(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in subsection (a) of this section, * * *.

* * * * * *

"the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. * * * If the Board finds upon the record of such hearing that such a question of representation exists,

it shall direct an election by secret ballot and shall certify the results thereof."

The terms "commerce" and "affecting commerce" are defined in 29 U.S.C.A. § 152, subsections (6) and (7), as follows:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

The phraseology of the statute is sweeping and comprehensive. It contains no restrictions, limitations, or exceptions. There are instances, however, in which a statute is not to be construed literally if such an interpretation would defeat the legislative intent. There are certain canons of statutory construction that serve as guides and aids in determining the intent of the Congress and the meaning of statutes. These precepts must be considered and given appropriate weight depending upon the circumstances of each case.

■ First, if there are two possible constructions of a statute, one of which may give rise to a constitutional question while the other would not create such a problem, the latter should be preferred, Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598; I. C.

---

**3.** Emphasis supplied.

C. v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 40, 53 S.Ct. 266, 77 L.Ed. 588. To be sure, in the case at bar the plaintiff does not raise any constitutional issue but relies solely on what it urges to be the proper construction of the statute,—else it necessarily would have applied for the convening of a three-judge statutory court. Nevertheless, such a question lurks in the background and its probable presence may well be weighed by the court in determining how the statute should be interpreted.

■ If at all possible, any construction of a statute that would be violative of the principles of international law should be avoided. Thus, Mr. Chief Justice Marshall had occasion to observe that, "an Act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains", The Charming Betsy, 2 Cranch 64, 118, 2 L.Ed. 208.

■ An Act of Congress, no matter how universal the scope of its terms may be, will ordinarily be confined in its operation and effect to the territorial limits of the United States, unless the contrary intention is clearly and affirmatively expressed. American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826; Sandberg v. McDonald, 248 U.S. 185, 195, 39 S.Ct. 84, 63 L.Ed. 200; Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680; Air Line Dispatchers Ass'n v. National Mediation Board, 89 U.S.App.D.C. 24, 189 F.2d 685, 690.

■■ Repeals by implication are not favored. In other words, a statute will not be construed to repeal by implication an earlier enactment if it is at all possible to reconcile both. A fortiori this principle applies when there is an apparent inconsistency between an Act of Congress and an earlier treaty. If at all feasible the Act of Congress will be so interpreted and applied as not to affect the provisions of the treaty. Chew Heong v. United States, 112 U.S. 536, 549, 5 S.Ct. 255, 28 L.Ed. 770; Cook v. United States, 288 U.S. 102, 121, 53 S.Ct.

305, 77 L.Ed. 641; Pigeon River Improvement, Inc. Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695. In the Cook case, supra, it was said that "A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed".

■ The literal meaning of a statute may not be followed and applied in such a manner as to produce an absurd result or one that is unreasonable and plainly at variance with the policy of the legislation as a whole. To avoid such a consequence, the courts will at times imply limitations and exceptions in a statute that the legislative body has not inserted. Thus it was said in Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226:

> "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers. * * * This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, make it unreasonable to believe that the legislator intended to include the particular act."

Among the many cases holding to the same effect, are United States v. Kirby, 7 Wall. 482, 486, 19 L.Ed. 278, and United States v. American Trucking Ass'ns., 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345. In the Kirby case, it was stated (pp. 486–487 of 7 Wall.):

> "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It

will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

It may be helpful to consider the construction and application of other Acts of Congress to foreign merchant ships entering American ports. For example, it was held that an Act of Congress prohibiting the making of advances of wages to seamen, did not apply to a foreign ship with a foreign crew putting in at an American port, if the advances had been made outside of the United States. This result was reached in spite of the fact that the statute contained no such exception, Sandberg v. McDonald, 248 U.S. 185, 39 S.Ct. 84, 63 L.Ed. 200. On the other hand, a law entitling seamen to receive one-half of accrued wages in every port that the ship entered, was held applicable to foreign ships while in an American port in respect, however, only to wages that had accrued. Strathearn S. S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607. It will be observed that the last mentioned case involved an action required to be performed in the United States, while the former held the statute inapplicable to activities that took place abroad.

The National Prohibition Act was held applicable to foreign merchant ships while in American ports. Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894. The Government, however, did not attempt to prosecute personnel of such a ship for having intoxicating liquor on board, as perhaps a literal construction of the statute might have permitted. The Government merely insisted on requiring that such liquor be sealed while the ship was in an American port. This contention of the Government was approved by the Supreme Court.

The Eight Hour Law (40 U.S.C.A. § 321 et seq.) governing employment on Government contracts was held inapplicable to Government work performed in a foreign country, even though the statute used the terms "every contract" and included no exceptions, Foley Bros. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680.

The Jones Act (46 U.S.C.A. § 688) governing the rights of seamen to recover damages for personal injuries incurred in the course of employment, was held inapplicable to a member of the crew of a foreign ship who was injured while in a foreign harbor, Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254. Again, no express exception was included in the statute. In the course of his opinion, Mr. Justice Jackson stated (p. 582, 73 S.Ct. p. 928):

"But in dealing with international commerce we cannot be unmindful of the necessity for mutual forbearance if retaliations are to be avoided; nor should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction."

The question whether the Labor Management Relations Act of 1947 applies to foreign vessels operated by foreign seamen shipped under foreign articles, while the vessel is temporarily in an American port, was answered in the negative in Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709. That case involved a ship that sailed into harbor at Portland, Oregon. It was flying a Liberian flag and was owned by a Panamanian corporation. The crew was made up entirely of nationals of foreign countries, who had signed a British form of articles of agreement at Bremen. While the ship was at anchor at Portland, members of the crew went on strike and picketed the vessel. They designated the Sailors' Union of the Pacific as their collective bargaining representative. The picketing was eventually stopped by an order of the court. An action for damages against the Union was filed by the owners of the vessel. The defendants urged

that the trial court was without jurisdiction, on the ground that the Labor Management Relations Act had preempted the field. This contention was overruled and it was held that this statute was not applicable. The court indicated that it was not the purpose of Congress to resolve labor disputes between nationals of other countries operating ships under foreign laws (pp. 142, 143, 77 S.Ct. pp. 701, 702). The Court further stated that in order to construe this statute as applicable in such a delicate field of international relations there had to be present the affirmative intention of the Congress clearly expressed (p. 147, 77 S.Ct. p. 704).

This decision would seem to be dispositive of the issue presented in the case at bar, were it not for the contention advanced by counsel for the defendants and counsel for the intervenor that it was overruled, or at least limited, by the subsequent ruling of the Supreme Court in Marine Cooks and Stewards, etc. v. Panama S. S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797. That case involved a Liberian ship manned by an alien crew, whose employment contracts had been executed outside of the United States. The ship put in at Tacoma, Washington, for the purpose of delivering cargo. Marine Cooks and Stewards, AFL, an American Labor union, picketed the vessel. Its owner brought suit for an injunction against this activity. It was held that the Court lacked the power to issue such an injunction because of the prohibitions of the Norris-LaGuardia Act (29 U.S.C.A. § 101 et seq.), which precluded the granting of injunctions in labor disputes except under certain circumstances. Counsel argued that since the Norris-La Guardia Act was applicable, the situation must have been deemed to involve a labor dispute within the meaning of the Labor Management Relations Act. This reasoning is, however, a *non sequitur*. There may indeed be labor disputes outside of the scope of that Act and beyond the jurisdiction of the National Labor Relations Board. The Court expressly referred to the Benz case and did not disapprove it or narrow it in any way.

Finally, reliance is placed on Vermilya-Brown Co. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76, in which it was held that the Fair Labor Standards Act (29 U.S.C.A. § 201 et seq.) covered employees of American contractors engaged in the construction of a military base for the United States in an area in Bermuda leased by Great Britain to the United States for ninety-nine years. The question determined by the Court, however, was solely whether the term "possession" as used in the Act to define its geographical coverage, should be construed as comprizing a base leased by the United States in a foreign territory for a long term. This question was answered in the affirmative as against a vigorous dissenting opinion written by Mr. Justice Jackson and in which three other members of the Court concurred. The case has no bearing on the problem confronted in this case.

This Court, therefore, reaches the conclusion that the Labor Management Relations Act of 1947, should be construed as not conferring any authority or power on the National Labor Relations Board to conduct elections for collective bargaining purposes among foreign seamen manning vessels flying a foreign flag, and employed under contracts executed in a foreign country pursuant to foreign law. The fact that the corporation that owns the ship may be a subsidiary of an American corporation does not affect this result. Consequently the Board was without power or authority to issue the order directing the election in this instance.

Accordingly, the plaintiff's motion for a preliminary injunction is granted and the defendants' motion to dismiss the complaint is denied. Counsel may submit an appropriate order.

This discussion would seem to lead to a final disposition of this litigation insofar as this Court is concerned. This is not possible, however, on the present

state of the record, in view of the fact that the plaintiff has made no motion for summary judgment. No doubt this was due to the twenty-day limitation prescribed by Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., since the twenty-day period from the commencement of the action had not expired when the present motions were argued. As this period has now elapsed, the Court would entertain such a motion at this time.