**UNITED STATES v. CORDOVA et al.**

No. Cr. 42082.

United States District Court
E. D. New York.
March 17, 1950.

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y. (M. Jay Meckler, Assistant United States Attorney, New York City, of counsel), for plaintiff.

Dominic M. Mello, Brooklyn, N. Y., for defendant Cordova.

KENNEDY, District Judge.

On March 30, 1949, an information was filed against the defendant Cordova, along with one Santano, the charge consisting of four counts: 1) that on August 2, 1948 Cordova assaulted one Machada, pilot of an airplane owned by Flying Tigers, Inc., an American corporation, while the plane was flying over the high seas from San Juan, Puerto Rico, to New York; 2) that at the same time and place Cordova assaulted one Santiago, stewardess of the air carrier; 3) that at the same time and place Cordova assaulted the codefendant Santano; and 4) that at the same time and place Santano assaulted Cordova.

The statutory bases for jurisdiction alleged in the information are respectively (a) the act forbidding striking, wounding and beating and simple assault within the admiralty and maritime jurisdiction of the United States, 18 U.S.C.A. § 455, now 18 U.S.C.A. § 113(d) and (e), (b) the act defining the admiralty and maritime jurisdiction, 18 U.S.C.A. § 451, now 18 U.S.C.A. § 7, and (c) the venue statute for the prosecution of crimes within the admiralty and maritime jurisdiction, 28 U.S.C.A. § 102, now 18 U.S.C.A. § 3238. The pertinent portions of these statutes, as they existed on August 2, 1948, the date of the alleged offenses, are given in the margin:[1]

As will appear shortly, after the facts have been outlined, the revision of the criminal code has no bearing on the case: the relevant statutes are substantially the same now as they were at the time of the offenses set forth in the information.

When the trial commenced, the government moved to dismiss the fourth count of the information (which charges the codefendant Santano with assault upon the defendant Cordova), a jury was waived, and the cause was tried to the court. Motions appropriate to challenge the jurisdiction of the court over the offenses charged were made at every stage of the case. These included a motion addressed to the information, a motion for the direction of an acquittal at the end of the government's case, and the same motion at the end of the whole case, coupled with a motion in arrest of judgment.

---

1. Title 18 U.S.C.A. § 451, reads in part: "Places and waters applicable; on board American vessel on high seas or Great Lakes; on land under exclusive control of United States; guano islands. The crimes and offenses defined in this chapter shall be punished as herein prescribed:

"First. When committed upon the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, or when committed within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State on board any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, or District thereof."

Title 18 U.S.C.A. § 455 (part of the same chapter) is entitled "Felonious assaults; to murder or rape; other felony; with weapons; beating; simple assault." and reads in part: "Whoever shall unlawfully strike, beat, or wound another, shall be fined not more than $500, or imprisoned not more than six months or both. Whoever shall unlawfully assault another, shall be fined not more than $300, or imprisoned not more than three months, or both."

Title 28 U.S.C.A. § 102 is entitled "Offenses on the high seas." and reads: "The trial of all offenses committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

The facts are simple and clear. At 6:42 P.M., New York time, the carrier plane DC-4 No. NC-90911 took off from San Juan Airfield in Puerto Rico, bound for New York. The plane is the property of Flying Tigers, Inc., an American corporation, and at the time of the flight was under charter to Air America, Inc., another American corporation, organized under the laws of California. On board when the flight began were 60 passengers and 6 crew members. Of the passengers 43 were adults, 11 were children under 2 years of age, and 6 were children over that age.

At 8:15 P.M. on August 2, 1948 the plane, travelling at an air speed of 180 m. p. h., was over the Atlantic Ocean on a course 324 degrees true bound for Charleston, S. C., having been on her course for 1½ hours. This means that the plane was to the northward of the Bahama Islands at a point approximately 270 miles northwest of San Juan, Puerto Rico. The plane's altitude was 8,500 feet. At that time (8:15 P.M., August 2, 1948) the plane became tail heavy, and her indicated air speed fell from 180 miles per hour to 150 miles per hour. The nose was rising so fast that the automatic pilot could not make corrections which would keep the ship on an even keel, and it became necessary to adjust the instrument. At this juncture the steward notified the pilot Machada that there was a fight going on in the passenger compartment. Machada turned the controls over to his First Officer and went aft. What he found was a brawl in progress between the passengers Cordova and Santano, which the steward and the stewardess (one Santiago) had been attempting to stop in vain. The passengers had crowded aft to watch the fight; it was because of this fact that the plane had become tail heavy.

Machada intervened, with the result that the defendant Cordova bit him on the shoulder, and during this portion of the fracas Cordova struck not only his adversary Santano, but also the stewardess Santiago.

The story of the origin of the fight is an old one. Apparently when these planes leave from San Juan, the relatives and friends of the passengers participate in a bon voyage celebration, the principal attraction being Puerto Rican rum in large quantities. And to fortify themselves for the flight, on this particular occasion many of the passengers, including Cordova and Santano, had boarded the plane with bottles of rum in paper shopping bags, which they took to their seats. Cordova and Santano had been toasting each other effusively for the first part of the flight, but soon a dispute arose over a missing bottle. Cordova seems literally to have gone beserk: while the main object of his viciousness was Santano, anyone else who crossed his path, including the captain of the plane, was in danger. The efforts of Machada (the captain) to subdue Cordova were reasonable. He began by attempting to hold Cordova's arms. At that time the weather being warm, Machada was wearing no flight jacket, and Cordova, attempting to free himself, bit Machada in the shoulder, drawing blood and necessitating first aid treatment. Eventually Cordova was locked up in a compartment.

■ The plane landed at La Guardia Field at 4:45 A.M. on August 3, 1948. Cordova and Santano were immediately apprehended in this District and charged with assault. It thus appears that the venue requirements of the statute, 28 U.S.C.A. § 102, heretofore quoted in the margin, are satisfied if a crime within the jurisdiction of the United States Courts was committed. It is also plain that Cordova did, in fact, and without just cause or excuse strike and bite Machada (count 1), Santiago (count 2), and Santano (count 3). The case under the third count is weaker than the others, because Santano was at least in the beginning himself an active participant in the fight. Later, however, he attempted to retreat when the pilot of the plane and the stewardess intervened and the striking or biting which were then committed by Cordova on all three victims clearly violated the terms of the specific substantive statute, 18 U.S.C.A. § 455, heretofore quoted in the margin.

But the statute condemning striking, wounding and beating, and simple assault, within the admiralty and maritime jurisdiction of the United States does not become

operative unless the acts complained of meet one of two tests, 18 U.S.C.A. § 451: (1) Were those acts committed on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State? or (2) Were those acts committed within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State on board any vessel belonging in whole or in part to the United States or any citizen thereof or any corporation created by or under the laws of the United States, or of any State, Territory or District thereof?

The second question gives less difficulty than the other, and perhaps should be dealt with first. The answer that ought to be made turns on the question whether an airplane is a vessel, within the meaning of the statute, and obviously the answer should be in the negative.

In the famous Reinhardt case, Reinhardt v. Newport Flying Service Corp., 1921, 232 N.Y. 115, 133 N.E. 371, 18 A.L.R. 1324, Judge Cardozo, speaking for the unanimous Court of Appeals, held that a hydroplane, which had been moored in navigable waters and had begun to drag her anchor was within the admiralty jurisdiction. This holding was necessary for the decision of the case, because the problem before the court was whether the New York State Workmen's Compensation Commission had jurisdiction to make an award to an employee engaged in attempting to save the plane when she was in danger of being wrecked. The lower courts had upheld the Commission's jurisdiction, but the Court of Appeals reversed. Once the conclusion was reached that while afloat in navigable waters a hydroplane is a "vessel" within the admiralty jurisdiction, it became clear that the jurisdiction of the Compensation Commission was excluded. Knickerbocker Ice Co. v. Stewart, 1919, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145.

Judge Cardozo was careful to point out in dictum that even a hydroplane, while in the air, is not subject to the admiralty, citing Crawford Bros, No. 2, D.C.Wash. 1914, 215 F. 269, 271, a case which held that the admiralty has no jurisdiction to enforce a lien for repairs against an airplane on the theory that it is a vessel. The rationale of the Crawford case was that planes "are neither of the land nor sea, and, not being of the sea or restricted in their activities to navigable waters, they are not maritime". A similar conclusion was reached, after the Reinhardt decision, in United States v. Northwest Air Service, Inc., 9 Cir., 1935, 80 F.2d 804. There an unsuccessful attempt was made to assert a maritime lien against an airplane libeled by the United States because of violations of the Air Commerce Act of 1926, 49 U.S.C.A. §§ 177(b), 181(b), the Tariff Act of 1930, 19 U.S.C.A. §§ 1454, 1459, and the Customs Regulations of 1931. The basis for the rejected maritime lien was the performance of work on the plane's engine while she was in a hangar on the shore of Lake Washington.

■ Objection may be made that the cases so far mentioned are civil cases, and for that reason have no important bearing on questions of federal criminal jurisdiction. However, in McBoyle v. U. S., 1931, 283 U.S. 25, 51 S.Ct. 340, 341, 75 L.Ed. 816, Mr. Justice Holmes, construing the National Motor Vehicle Theft Act, held that it did not apply to a case where an airplane was stolen. The language of the criminal statute, 18 U.S.C.A. § 408 [now § 2311], was very broad: "The term 'motor vehicle' when used in this section shall include an automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails". Of course, literally an airplane is a self-propelled vehicle not designed for running on rails. But Mr. Justice Holmes reasons that Congress was using the word "vehicle" in the popular sense, and that even though airplanes were well-known in 1919 when the statute was passed, Congress had laid down a rule of conduct "in words that evoke in the common mind only the picture of vehicles moving on land". By parity of reasoning, when, 18 U.S.C.A. § 451, Congress speaks of a "vessel" within the admiralty and maritime jurisdiction of

the United States, it evokes in the common mind a picture of a ship, not of a plane.

Similarly, in another criminal case, a statute, 18 U.S.C.A. § 469, making it a misdemeanor for any person to stow away on a vessel, was held inapplicable to a case where the defendant had stowed away on an airplane. U. S. v. Peoples, D.C.Cal.1943, 50 F.Supp. 462. The Reinhardt and Mc-Boyle cases are discussed in the opinion, as well as Noakes v. Imperial Airways, D.C. S.D.N.Y.1939, 29 F.Supp. 412, where an airplane was denied the right to limit liability in the admiralty, a right which Congress has accorded to "vessels". After the decision in the Peoples case, Congress adopted the suggestion of the judge who wrote the opinion and modified the law specifically to include aircraft within its coverage, 18 U.S.C.A. § 2199, see 58 Stat. 111, Mar. 4, 1944.

Finally, and on the negative side, the Reinhardt case, even to the extent that it holds a drifting plane to be a vessel, has been legislated out of existence. The Air Commerce Act of 1926, 49 U.S.C.A. § 171 et seq., now contains a section, 49 U.S.C.A. § 177.(a), providing that: "The navigation and shipping laws of the United States, including any definition of 'vessel' or 'vehicle' found therein and including the rules for the prevention of collisions, shall not be construed to apply to seaplanes or other aircraft or to the navigation of vessels in relation to seaplanes or other aircraft".

█ It seems, therefore, clear on precedent and on principle that even after airplanes become well-known, both Congress and the courts, saving the Reinhardt case, refused, and still refuse, to consider them as vessels even when they were afloat. In the instant case the plane was in flight, and it seems beyond argument that Cordova's acts cannot be prosecuted under a statute dealing with crimes committed on a "vessel".

It now becomes necessary to return to the first branch of the statute, which denounces certain crimes committed on the high seas or other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular state, 18 U.S.C.A. § 451. Beyond any doubt, Cordova's misconduct took place over the high seas. Is it proper, then, in a criminal case, to extend federal criminal jurisdiction to a plane in flight *over* the high seas under a statute which speaks of crimes committed *upon* the high seas or *on* any other waters within the admiralty and maritime jurisdiction of the United States? It is, of course, ridiculous to suppose, as Mr. Justice Holmes says in the McBoyle case, that any criminal considers the text of the law before he murders or steals. At the same time it is important that a rule of conduct must be considered in the light of the "picture" it evokes in the common mind.

It is perhaps irrelevant, but I have little doubt that had it wished to do so Congress could, under its police power, have extended federal criminal jurisdiction to acts committed on board an airplane owned by an American national, even though such acts had no effect upon national security.[2] In U. S. v. Flores, 1933, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086, the Supreme Court of the United States went the extreme length of holding that the criminal jurisdiction of the United States, under this very statute, 18 U.S.C.A. § 451, was broad

---

2. The reason I mention "national security" is this. It seems clear that Congress can denounce as crimes acts affecting the well-being of the government, and committed by American nationals, even when those acts take place on land within the jurisdiction of a foreign sovereign. U. S. v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149; United States v. Chandler, D.C.Mass.1947, 72 F.Supp. 230, affirmed 1 Cir., 1949, 171 F.2d 921, certiorari denied 1949, 336 U.S. 918, 69 S.Ct. 640, rehearing denied 1949, 336 U.S. 947, 69 S.Ct. 809. But Congressional power over vessels on the high seas, or in admiralty waters outside the jurisdiction of any state, is even wider. It can be exercised to punish acts (such as assault) which have no relationship to national security. A different theory of jurisdiction comes into play, namely, that the American flag vessel is itself territory of the United States. There are no international complications, as there might be for land crimes against a person.

enough to include acts committed on an American flag vessel, even though she was within the territorial waters of another sovereign. The Court has even suggested that a State of the union may make a regulation valid and effective to rule conduct on the high seas, so long as the federal government has not occupied the field Skiriotes v. Florida, 1941, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193. And on occasion the Supreme Court has not been over technical to ascertain whether the crime was committed on the ship itself or in adjacent waters. United States v. Holmes, 1820, 5 Wheat. 412, 5 L.Ed. 122. For such a case the expression "high seas" was held to have a general meaning, and a similar result was reached when the Court was dealing with the question whether the term "high seas" was applicable to the Great Lakes. United States v. Rodgers, 1893, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071.

But none of these cases, nor the principles on which they rest, would justify the extension of the words "high seas" to the air space over them. It is at this point that the case at bar, I think, becomes one of first impression. The proper approach is, nevertheless, to be gathered, for example, from United States v. Wiltberger, 1820, 5 Wheat. 76, 5 L.Ed. 37. In that case the master of an American ship lying in the river Tigris off Wampoa in China was charged with manslaughter committed on board the vessel. The prosecution was laid under the Act of April 30, 1790, 1 Stat. 112. One section of that statute dealt with murder committed on the high seas, or any river, haven, basin or bay out of the jurisdiction of any particular state. Another section of the *same statute* dealt with manslaughter committed upon the high seas, but the other places were not mentioned. The Court was asked by the government to transfer the broader jurisdictional scope over murder to the crime of manslaughter, and to make the offense punishable when committed on a river, which did not come within the place-coverage of the words "high seas". Chief Justice Marshall re-

fused to make any such judicial extension of the legislative definition, even though he agreed with the government that it was extremely improbable that Congress actually intended to make a fine jurisdictional definition as between murder and manslaughter. In other words, Congress, having limited jurisdiction over manslaughter to the "high seas", the Supreme Court held that the denounced acts, committed elsewhere, could not be punished on any theory of a probable Congressional intent to include those places.

█ The acts for which Cordova stands charged were vicious in the extreme. He jeopardized the lives of others on the plane, including a considerable number of infants. But it seems to me clear that those acts have not been denounced by a statute which forbids them when committed on board an American "vessel", or when committed on the "high seas".

The situation may call for correction. There has been for some years discussion by experts in the field of aeronautic law of how the problem can be solved. For example, the so-called de Wisscher Draft Convention of 1937 suggests that crimes of this character ought to be punishable under the laws of the state of which the victim is a national, or of which the accused is a national, or of the state where the airplane arrives, if, in the latter case, what was done affects its security interests. The British Air Navigation Act of 1920 provides that any offense committed on a British aircraft shall be deemed committed in any place where the offender may for the time be. It is my understanding that French criminal law applies to French aircraft in flight any place in the world. Air Nav.Law 1924, Title V, Art. 20. Italian law, I have been told, also applies to Italian planes in flight anywhere, although this may be merely a civil code.[3]

What I gather is that there is little likelihood, if any, of an international agreement involving, as it necessarily would, difficult and delicate questions of sovereignty.

3. For a resumé of the efforts of the experts to cope with this problem and for otherwise unavailable books and documents discussing these efforts I am indebted to Mr. Arnold W. Knauth, a member of the New York Bar.

However that may be, as the law now stands, acts like those committed by Cordova will go unpunished, unless the law of the domicile of the corporation can be considered to cover them.

I, therefore, find Cordova guilty of the acts charged. But I must arrest judgment of conviction since there is no federal jurisdiction to punish those acts.

I feel very strongly that the government should have the opportunity to review this decision. And I draw the attention of the United States Attorney to the procedure followed in U. S. v. Flores, supra, and also to the criminal appeals statute in its present form, 18 U.S.C.A. § 3731, which seems to give ample protection against appeal to the wrong court. For what it may be worth, I certify that my decision turns on no issue of fact, but merely the determination of a question of law, namely, the construction of 18 U.S.C.A. § 451 and § 455.[4]

4. It is true that I have found the facts against Cordova, including intent, wilfullness, and lack of excuse. But I have construed the statute on the basis of what the information says concerning the place of the offenses, and this is a fact not in dispute nor capable of debate. It may seem odd that fact-finding and a verdict of guilty are combined with an order in arrest of judgment because of want of jurisdiction. But I thought this procedure wise because, in the event my decision is wrong, I can proceed to sentence under the mandate, and save another trial.