Bruce SMITH, as personal representative of Ingrid Smith, deceased, Plaintiff,

v.

The SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA et al., Defendants.

Paul S. HUDSON, as personal representative of the Estate of Melina K. Hudson, deceased, Plaintiff,

v.

The SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Defendant.

Nos. 94–CV–5556 (TCP), 94–CV–5557 (TCP).

United States District Court, E.D. New York.

May 17, 1995.

Memorandum Correcting Decision June 12, 1995.

Douglas E. Rosenthal, Timothy C. Russell, and Daniel N. Segal, of Sonnenschein, Nath & Rosenthal, Washington, DC, Alan Gerson and Mark Zaid, of Shapiro & Olander, Washington, DC, for plaintiff Bruce Smith.

Richard D. Emery, P.C., of Lankenau, Kovner & Kurtz, New York City, for the plaintiff Paul S. Hudson.

John R. Bartels, Jr., of Bartels & Feureisen, White Plains, NY, for defendants Socialist People's Libyan Arab Jamahiriya et al.

### MEMORANDUM & ORDER

PLATT, District Judge.

Plaintiffs Bruce Smith and Paul Hudson, as personal representatives of victims who died in the bombing of Pan American Airways, Inc. (Pan Am) Flight 103 over Lockerbie, Scotland, on December 21, 1988, seek to recover civil damages.[1] Smith sues the So-

---

1. Bruce Smith represents the estate of his deceased wife Ingrid Smith. Paul Hudson repre-

cialist People's Libyan Arab Jamahiriya, the Libyan Arab Airlines, The Libyan External Security Organization, Abdel Basset Ali Al–Megrahi and Lamen Khalifa Fhimah as agents and instrumentalities of Libya. Hudson sues the Socialist People's Libyan Arab Jamahiriya (heretofore defendants for both cases are referred to as "Libya").[2] For the purposes of this motion, the claims of Mr. Smith and Mr. Hudson will be considered in tandem. Pursuant to Federal Rule Civil Procedure 12(b), Libya moves this Court to dismiss plaintiffs' claims. Defendants' motion to dismiss both actions is granted as the Federal Sovereign Immunities Act precludes the plaintiffs from bringing this action in the United States courts against the State of Libya and its agents.

## BACKGROUND

On December 31, 1988, Pan Am Flight 103 left Frankfurt, Germany bound for Detroit with stops in London and New York. At about 7:00 p.m., Flight 103 exploded over Lockerbie, Scotland killing all 270 persons aboard, including passengers Mrs. Smith and Mrs. Hudson.

Plaintiff Smith alleges that Pan Am Flight 103 was destroyed by a bomb and that "[t]he actions of Libya in encouraging and sustaining these private acts [of terrorism] led to the deliberate and willful destruction of [the plane]." (Smith Complaint ¶ 11). Smith asserts tort claims for wrongful death, battery, infliction of emotional distress, loss of consortium and violation of international law. Plaintiff Hudson claims the alleged bomb "was placed on board the aircraft and detonated by and at the direction of Libya...." (Hudson Complaint ¶ 11). Hudson seeks to recover for the intentional torts of wrongful death and personal injury. (H.Complt. ¶¶ 15–20).

Mr. Smith and Mr. Hudson have sued previously to recover for the injuries alleged in this matter. In June, 1993, Smith filed a wrongful death action against Libya in Scot-

land. Hudson joined in the multidistrict tort action (MDL 799) against Pan Am before this Court in which the jury held Pan Am responsible for the destruction of the airplane.

## DISCUSSION

Pursuant to FRCP Rule 12(b) the defendants move this Court to dismiss plaintiffs' claims for (i) lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA); (ii) lack of subject matter jurisdiction under principles of International Law; (iii) lack of personal jurisdiction on the grounds of Constitutional due process; (iv) pendency of prior parallel actions; and (v) as time barred.

Plaintiffs contend the FSIA sovereign immunity defense does not foreclose their claims because (i) the United States is party to certain international agreements within the United Nations system which authorize United States Courts to exercise subject matter jurisdiction over Libya; (ii) the injuries tortiously inflicted by Libya occurred in the United States for the purposes of applying the FSIA; and (iii) Libya impliedly waived sovereign immunity under FSIA when it provided a guaranty to pay certain compensation and/or when it violated the *jus cogens* norm.

As the FSIA controls whether a foreign sovereign is to be denied sovereign immunity, this Court only considers the issues raised here in the context of the FSIA. *See, Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989) (the FSIA is the "sole basis for obtaining jurisdiction over a foreign state in federal court").

### *Foreign Sovereign Immunities Act*

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11, provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of

---

sents the estate of his deceased wife Melina K. Hudson.

**2.** Since the filing of this Motion to Dismiss, plaintiff Hudson has filed an Amended Com-

plaint in which he sues additional parties. This Court will consider the Motion to Dismiss as to the defendants named in the original complaint, as that was the complaint at issue at the time of the filing of the Motion.

the United States and of the States except as provided in sections 1605 and 1607 of this chapter." 28 U.S.C. § 1604 (1988). The excepted categories which preclude foreign nations from using the sovereign immunity defense are:

§ 1605 General exceptions to the jurisdictional immunity of a foreign state. 28 U.S.C. § 1605 (1988).

(a) A foreign state shall not be immune from the jurisdiction of the courts of the United States ... in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect in accordance with the terms of the waiver.

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States

(3) in which rights in property taken in violation of international law are in issue . . .

(4) in which rights in property in the United States acquired by succession . . .

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death ... occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance ... [of] a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights ...

§ 1607. Counterclaims ...

1. **Subject Matter Jurisdiction Based on the 28 U.S.C. § 1604 Existing Agreement Exception.**

■ As noted, FSIA preserves jurisdiction over a foreign state to the extent such jurisdiction exists under any international agreement to which the United States was a party at the time the statute was enacted. 28 U.S.C. § 1604. This "existing agreement" exception "applies when international agreements 'expressly conflic[t] with the immunity provisions of the FSIA.'" *Amerada Hess,* 488 U.S. at 442, 109 S.Ct. at 692 (citing and quoting H.R.Rep. No. 94–1487, p. 17 (1976) (H.R.Rep.); S.Rep. No. 94–1310, p. 17 (1976) (S.Rep.), U.S.Code Cong. & Admin.News 1976, p. 6604).

a. **Time Limit**

■ Plaintiffs assert that the United Nations ("UN") Charter of 1945 (Charter), entered into by the United States prior to the passage of the FSIA in 1976, is an agreement which could preserve jurisdiction over a foreign nation pursuant to § 1604.[3] Plaintiffs seek to expand the jurisdiction provided by § 1604 to include resolutions passed by the UN Security Counsil, pursuant to Article VII, regardless of the date of passage, on the theory that such resolutions are "elaborations" of the terms of the Charter and therefore should be accorded the same status as the Charter.[4] U.N. CHARTER art. VII. Specifically, plaintiffs request that Security Council Resolutions 731 and 748, which call on Libya to accept responsibility for the bombing of Pan Am 103, be deemed international agreements which confer jurisdiction under § 1604. S.Res. 731, U.N. SCOR, 3033rd Mtg. (1992); S.Res. 748, U.N. SCOR, 3063rd Mtg. (1992).

Security Counsil Resolutions 731 and 748 do not confer jurisdiction upon this Court as

---

3. The United Nations Charter "is part of the supreme law of the land." *United States v. Steinberg,* 478 F.Supp. 29, 33 (N.D.Ill.1979).

4. **Article VII** of the Charter specifies the U.N.'s Police Power.

**Article 25** of the Charter provides "[t]he members of the United Nations agree to accept and carry out the decisions of the Security Council in accordance with the present Charter."

they do not meet the criteria set forth in the "existing agreement" exception in § 1604. The plain language of § 1604 requires that the international agreement at issue be in existence in 1976 when the FSIA was passed. Security Council Resolutions 731 and 748 were passed in 1992. This Court does not adopt plaintiffs' broad view that because the Resolutions were passed pursuant to powers created by the UN Charter that they are an "elaboration" of the Charter so that this Court should treat them as being passed on the same date as the Charter.

### b. Conflict with FSIA Immunity Provisions

■ Even if the plaintiffs convinced this Court that the Security Council Resolutions related back to the Charter so as to meet the time requirement, plaintiffs claims would fail as Article VII of the UN Charter and Resolutions 731 and 748 do not conflict expressly with the FSIA immunity provisions. *See, Id.* Article VII addresses the UN's police powers in the face of actual or threatened armed aggression and makes no mention of how victims of such armed aggression can seek civil relief. The Resolutions at issue condemn terrorism and seek to impose diplomatic and economic sanctions against Libya. As neither Article VII nor the Resolutions address the FSIA immunity provisions, there is no conflict between the provisions at issue which could provide the basis for jurisdiction.

### c. Private Right of Action

■ If jurisdiction was granted on the basis of the U.N. Resolutions plaintiffs' claims would not survive because the "agreement" at issue creates no private right of action. Plaintiffs argue that the incorporation of S/23308 [5] into Resolution 748, which calls on Libya to accept responsibility for the actions of Libyan officials and pay appropriate com-

pensation, provides the basis for a private right of action against Libya for the victims of Pan Am # 103.

■ "Treaties of the United States, though the law of the land do not generally create rights that are privately enforceable in courts." *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J. concurring) (citations omitted), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). If there is no legislation providing an individual right of action, the Court may entertain a private claim only if the treaty is self-executing.[6] *Id.* (citations omitted). To determine if a treaty is self-executing the court examines "the intent of the signatory parties as manifested by the language of the instrument, and, if the instrument is uncertain, recourse must [be determined by examining] the circumstances surrounding its execution." *Diggs v. Richardson,* 555 F.2d 848, 851 (D.C.Cir.1976) (citing *Sei Fujii v. State,* 38 Cal.2d 718, 721–22, 242 P.2d 617, 620 (1952)).[7] The *Diggs* action was not viable because the provisions of the Resolution "were not addressed to the judicial branch of our government ... [and did not] by their terms confer rights upon individual citizens." *Id.* Rather, "they call[ed] upon governments to take certain action." *Id.*

Upon a careful reading of Article VII of the UN Charter and Security Counsel Resolutions 731 and 748, this Court holds that the Resolutions are not self-executing. As noted above, the Resolutions at issue condemn terrorism and impose economic and diplomatic sanctions against Libya. This Court finds that the primary purpose of S/23308 is to demand Libya participate in the criminal investigation of the Lockerbie disaster. The vague directive that Libya must "pay appropriate compensation" does not refer to our

---

5. S/23308: JOINT DECLARATION OF THE UNITED STATES AND UNITED KINGDOM
The British and American Governments today declare that the Government of Libya must:
—surrender for trial purposes all those charged with the crime; and accept responsibility for the actions of Libyan officials:
—disclose all it knows of this crime ...
—pay appropriate compensation.
We expect Libya to comply promptly and in full. G.A. S/23308, U.N. GAOR, 46th Sess., U.N.Doc. A/46/827 (1991).

6. A treaty is self-executing when it expressly or impliedly provides a private right of action.

7. *Diggs v. Richardson* considered whether a Security Council Resolution is self-executing. The Court found individual plaintiffs could not maintain a suit against the United States when the U.S. allegedly violated Security Council Resolution 301, which prohibited certain relations with South Africa.

judiciary system or confer upon an individual the right to sue Libya to recover "appropriate compensation." *Cf., Amerada Hess,* 488 U.S. at 442, 109 S.Ct. at 692 (The fact the Geneva Convention on the High Seas and the Pan American Maritime Neutrality Convention set forth substantive rules of conduct and state that compensation shall be paid for certain wrongs does not create private rights of action.)

### 2. Subject Matter Jurisdiction Based on the 28 U.S.C. § 1605(a)(2) Commercial Activity Exception.

■ FSIA § 1605(a)(2) grants an exception from sovereign immunity for claims based on commercial activity by the foreign nation that has a sufficient connection to the United States. As the plaintiffs' seek recovery for solely tortious injury, the commercial activity exception is not applicable in this case.[8]

### 3. Subject Matter Jurisdiction Based on the 28 U.S.C. § 1605(a)(5) Non Commercial Tort Exception.

As noted above, § 1605(a)(5) denies foreign sovereign immunity in any case "in which money damages are sought against a foreign state for personal injury occurring in the United States and caused by the tortious act or omission of that foreign state...." Defendants contend that the plaintiffs' case does not meet the requirement that the injury occur in the United States because Pan Am Flight 103 exploded in Scottish airspace and crashed on Scottish soil. Plaintiffs response is that the strict locality test should not be used in aviation cases and that as Pan

Am was an American airline the plane was actually part of the United States.

#### a. Strict Locality Test

[7] Plaintiffs claim that airplanes are "geographically unrestrained" so that the locality rule should be replaced with a flexible analysis, analogous to either maritime law principles or the modern approach for deciding conflicts of laws issues,[9] to determine where an aviation disaster occurred for the purpose of assigning jurisdiction. *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 266–68, 93 S.Ct. 493, 503–04, 34 L.Ed.2d 454 (1972) (In both death and injury cases ... it is evident that while distinctions based on locality often are ... relevant where water vessels are concerned, they entirely lose their significance where aircraft ... are concerned." (quoting 7A J. Moore, *Federal Practice, Admiralty* ¶.330(5), at 3772–3 (2d ed. 1972)).

Plaintiffs' reliance on the reasoning employed in *Executive Jet* to come to the conclusion that the locality rule should not be applied in aviation tort cases is unfounded. The *Executive Jet* case wrestled with the issue of whether maritime tort law should apply when a domestic flight crashes into navigable waters within state territorial limits and in determining that issue the Court discussed the random nature of the location of aviation accidents. 409 U.S. at 261–65, 93 S.Ct. at 501–03. That case does not reach the issue of how to determine jurisdiction if the plane crashes over land and it does not touch upon the issue of foreign sovereign immunity. Furthermore, the admiralty jurisdiction of the federal courts in relation to foreign governments in now ruled by the

---

**8.** The plaintiffs included this claim in their complaint but did not argue it in the Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss. This Court interprets the plaintiffs' decision not to include this matter in their motion papers as an indication of the weakness of this claim.

**9.** § 145 of the Restatement of Conflicts of Law, Second provides the basis for the modern approach to conflicts law.
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 (a) the place where the injury occurred.
 (b) the place where the conduct causing the injury occurred.
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties,
 (d) and the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

FSIA, which was not in effect in 1972 when the *Executive Jet* decision was rendered. 28 U.S.C. § 1605(b); *Amerada Hess*, 488 U.S. at 438, 109 S.Ct. at 690.

The remainder of the cases relied upon by the plaintiffs relate to issues of conflicts of law which arise from domestic aviation disasters. *See, In re Air Crash at Washington, D.C.*, 559 F.Supp. 333, 340–42 (D.C.Cir.1983) (which state's law should apply when residents of various states are involved in the same disaster); *O'Keefe v. Boeing Company*, 335 F.Supp. 1104, 1110–11 (S.D.N.Y.1971) (which state's conflicts law should apply when an Air Force plane stationed in Massachusetts crashed in Maine and the wrongful death action was brought in New York). In accordance with plaintiffs' use of conflicts of law principles they claim that because the plane was destined for the United States, Pan Am was an American airline and the majority of passengers were citizens of the United States the situs of the tort was actually the United States.

This Court finds plaintiffs' call for a flexible approach for determining the location of an international aviation tort for the purposes of determining jurisdiction unpersuasive as the law to be applied in this action is the FSIA, not federal maritime law or conflicts law. The plain language of § 1605(a)(5) states that foreign immunity is excepted only when the tort occurs in the United States. The Supreme Court restricts the definition the "United States" for the purposes of this statute to "the continental United States and those islands that are part of the United States or its possessions...." *Amerada Hess*, 488 U.S. at 440, 109 S.Ct. at 691. As this flight exploded above Lockerbie, Scotland and crashed into Scottish soil, and there is no authority which stands for the proposition that the locality test should not be used, this Court finds this tortious injury was inflicted in Scotland, not the United States.

### b. Pan Am Flight 103 as "Territory" of the United States

 Plaintiffs seek to expand the maritime law principle that ships are the territory of their flag nation to include commercial airplanes. *See, e.g., United States v. Flores*, 289 U.S. 137, 155, 53 S.Ct. 580, 585, 77 L.Ed. 1086 (1933) ("a merchant vessel ... is deemed to be a part of the territory" of "the sovereignty whose flag it flies."); *United States v. Cordova*, 89 F.Supp. 298, 302 (E.D.N.Y.1950) ("American flag vessel is itself territory of the United States"). Applying this territorial approach, the plaintiffs argue that Pan Am Flight 103 was American territory so that the tortious activity injury inflicted on Mrs. Hudson and Mrs. Smith "occurred in the United States."

Adopting plaintiffs' approach would require this Court to expand Supreme Court precedent and overstep the bounds of judicial authority. As noted above, for the purpose of enforcing the FSIA the Supreme Court has defined the United States as "the continental United States and those islands that are part of the United States or its possessions...." *Amerada Hess*, 488 U.S. at 440, 109 S.Ct. at 691. This Court has no authority to broaden that clear definition to include American commercial aircraft. If this Court were to rule in plaintiffs' favor it would be interfering with foreign relations as each nation has the right to regulate the land on which a distressed plane might crash and its own air space. *See, e.g.*, 49 U.S.C.App. § 1348 (1988) (authorizing Secretary of Transportation to regulate use of navigable air space). This Court reiterates that the tortious injury suffered in this case occurred on foreign soil and therefore does not fall within the non-commercial tort exception to the FSIA.

### 4. Subject Matter Jurisdiction Based on an Implied Waiver Pursuant to 28 U.S.C. § 1605(a)(1).

According to § 1605(a)(1), a foreign state can waive immunity "either explicitly or by implication...." In interpreting the FSIA "[f]ederal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) ... is to be construed narrowly." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2nd Cir.1991). Plaintiffs claim that Libya impliedly waived immunity when (1) Libya agreed to guaranty satisfaction of any civil damage awards against its operatives as a result of the bombing of Pan Am Flight 103 and (2) when Libya acted in a "non-sovereign" manner.

**314**

### a. The Guaranty

■ On February 27, 1992, Ibrahim M. Bishari, Secretary of the Libyan government's "People's Committee for Foreign Liaison and International Cooperation", sent a letter to the Secretary of the United Nations which stated:

> Despite the fact that discussion of the question of compensation is premature, since it would only follow from a civil judgment based on a criminal judgment, Libya guarantees the payment of any compensation that might be incurred by the responsibility of the two suspects who are its nationals in the event that they are unable to pay. S/23672, Report of Secretary–General (1992).

The plaintiffs contend this guaranty necessarily means that Libya contemplated the possibility of being haled into an United States court and therefore impliedly waived its right to sovereign immunity.

This Court disagrees with plaintiffs' self-serving interpretation of Mr. Bishari's letter. The above quoted clause indicates the Libyan government only agrees to guaranty civil damages which the Libyan criminal suspects cannot afford to pay when and if those suspects are convicted of criminal activity. The letter, read in totality, makes it clear that Libya does not intend to activate the provisions of that letter unless and until certain conditions are met. Specifically, the correspondence states "[t]he proposals contained in this draft shall be binding [when] . . . State terrorism against Libya shall end, there shall be a halt to threats and provocations against it . . . the economic boycott shall be ended . . . and its name shall finally be removed from the roster of terrorism." S/23672. As those conditions have not been met, this letter does not represent a true "international agreement" and therefore no provision therein can create an implied waiver of sovereign immunity.

■ Even if the Libyan government had guaranteed civil damages it does not necessarily follow that this Court would find Libya had impliedly waived its right to sovereign immunity pursuant to FSIA. "[B]y signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States" a foreign nation may not waive its immunity pursuant to § 1605(a)(1). *Amerada Hess*, 488 U.S. at 442–43, 109 S.Ct. at 693. As the letter makes no reference to our judicial system or the creation of a private right of action to be adjudicated in the United States, it does not necessarily impliedly waive Libya's right to immunity.

### b. Violations of the *Jus Cogens* Norm

■ To interpret the language of § 1605(a)(1) plaintiffs argue that the implied waiver of immunity provision codified pre-FSIA case law which held a state is divested of its sovereign character, including immunity, when it participates in non-sovereign acts. *See, United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 203 (S.D.N.Y.1929) (The Government of France's role as a shareholder in a private French corporation was not sovereign activity so that the corporation was not immune from suit in the United States). To define those acts which amount to an implied waiver plaintiffs look to "standards recognized under international law." H.R.Rep. No. 1487, 94th Cong., 2d Sec. 18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6617. Particularly, plaintiffs assert that Libya's alleged involvement in this bombing impliedly waived immunity as it was a non-sovereign action in the form of a violation of the *jus cogens* norm.

■ *Jus cogens* norm is an international law principle which is "accepted by the international community of States as a whole as a norm from which no derogation is permitted . . ." *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C.Cir. 1988) (quoting Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, U.N.Doc. A/Conf. 39/27, 8 I.L.M. 679). *Jus cogens* violations include "a handful of heinous activities—each of which violates definable, universal and obligatory norms." *Tel–Oren*, 726 F.2d at 781 (Edwards, J., concurring).

■ There is no authority which provides federal courts with the discretion to determine whether a nation has impliedly waived immunity by examining if that nation was acting in a "sovereign" or "non-sovereign" manner. The legislative history indicates that to decide whether immunity is impliedly

waived courts are to inquire as to the foreign government's subjective intent to avail itself to American jurisdiction. *Shapiro,* 930 F.2d at 1017. Congress provided three examples of activity which would warrant the finding of an implied waiver: (1) an agreement to arbitrate in another country, (2) an agreement that the laws of another nation will govern a contract, and (3) the filing of a responsive pleading without raising the sovereign immunity defense. *Id.* (citing H.R.Rep. No. 1487, 94th Cong., 2d Sec. 18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6617). As the instant case is not analogous to these three examples and because participating in "terrorist" activity does not indicate a foreign sovereign's amenability to suit, Libya has not impliedly waive its immunity pursuant to § 1605(a)(1).

The District of Colombia Circuit recently determined that the violation of the *jus cogens* norm is not an implied waiver of sovereign immunity. *Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1174 (D.C.Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995). That case concerned an American Jewish Holocaust survivor who was seeking to sue Germany for war reparations. *Id.* at 1168. The Circuit Court found the atrocities inflicted in the Nazi concentration camps were definitely horrendous violations of the *jus cogens* norm, but that such actions did not create an implied waiver of sovereign immunity as neither the Third Reich nor the modern German government ever indicated "its amenability to suit." *Id.* at 1168–69, 1174. This Court adopts the reasoning in *Princz.* Libya's alleged behavior was inhumane and violative of the *jus cogens* principle, but such actions do not demonstrate that Libya purposefully availed itself to our courts.

### CONCLUSION

Although Libya's alleged participation, if true, in this tragedy is outrageous and reprehensible and the human suffering involved is heartbreaking, this Court may not rightly obtain jurisdiction over Libya for the purposes of these private rights of action. Libya's alleged terrorist actions do not fall within the enumerated exceptions to the Foreign Sovereign Immunities Act and therefore Libya must be accorded sovereign immunity from suit.

SO ORDERED.

### *CORRECTING MEMORANDUM & ORDER*

On May 17, 1995, this Court granted defendants' motion to dismiss the above captioned actions. Although Abdel Basset Ali Al–Megrahi and Lamen Khalifa Fhimah, the two individual defendants named in plaintiff Smith's original complaint[1], did not join in the motion to dismiss filed by the other defendants, this Court inadvertently named them as defendants whose motion to dismiss had been granted.

This Court now corrects its Order dated May 17, 1995 to state that the motion to dismiss filed by the Socialist People's Libyan Arab Jamahiriya, the Libyan External Security Organization and the Libyan Arab Airlines is granted. As Messrs. Al–Megrahi and Fhimah did not join in that motion the complaint against them is not dismissed.

SO ORDERED.

---

1. Plaintiff Hudson's amended complaint, which was filed after the motion to dismiss, names these two individuals as defendants.